Hardy Joseph OWENS and John Link Cogdill, Appellants,

v.

UNITED STATES of America, Appellee.

No. 15039.

United States Court of Appeals Fifth Circuit.

April 15, 1955.

Rehearing Denied May 17, 1955.

**352**

Zach H. Douglas, Damon G. Yerkes, Edgar W. Waybright, Sr., Jacksonville, Fla., W. L. Robinson, Miami, Fla., for appellants.

Edith House, Asst. U. S. Atty., Jacksonville, Fla., James L. Guilmartin, U. S. Atty., Miami, Fla., for appellee.

Before HUTCHESON, Chief Judge, TUTTLE, Circuit Judge, and DAWKINS, District Judge.

TUTTLE, Circuit Judge.

Appellants were convicted below of using the mails in furtherance of a scheme to defraud,[1] using an instrumentality of communication in interstate commerce to sell or attempt to sell fraudulent securities,[2] and conspiracy.[3] The indictment was very lengthy, containing eight counts, the first five of which charged violations of the mail fraud statute, counts six and seven of which pertained to the fraudulent securities statute, and count eight of which alleged a conspiracy to commit these substantive crimes. The trial court directed an acquittal of count six because of insufficient proof. Appellant Owens was convicted on all other counts and was sentenced to five years' imprisonment on each count, sentences to run concurrently. Appellant Cogdill was convicted of counts 1, 2, 4, 5, 7 and 8, but his motion for acquittal was subsequently granted as to count seven, and he was thereupon sentenced to two years' im-

1. 18 U.S.C.A. § 1341.

2. 15 U.S.C.A. § 77q(a) (1).

3. 18 U.S.C.A. § 371.

prisonment to run concurrently on each of the remaining counts.

The appeals raise three questions:

(1) Was the indictment duplicitous, in that each count alleged two or more separate schemes to defraud, as the appellants contend, and contended below in a motion to dismiss?

(2) If not, was there a material variance between the proof and the indictment, in that the proof showed separate and distinct schemes, as appellants contend, and contended below in motions for acquittal?

(3) Was the proof insufficient to support the convictions; and particularly, with respect to Cogdill was the proof insufficient for the jury to find that he was connected with or knowingly participated in any fraudulent scheme?

We think all of these questions must be answered in the negative, and that the convictions must be affirmed.

1. Count one of the indictment was seven pages long. It charged in considerable detail that over a period between 1950 and 1952, appellants devised a scheme to defraud persons who could be induced by false pretenses, representations, and promises to entrust money to appellants or invest in corporations controlled by them, in connection with transactions to be effected by appellants or such corporations; that they organized the Dade County Terminal Company, Inc., the *Societe Nationale de Credit Agricole et Industriel, S.A.,* and the Habanex Haitian Bananas Export, S.A., and issued shares of those corporations to themselves without giving anything of value therefor, using sham stockholders and officers; that the corporations never operated; that they knowingly and falsely represented that Owens was a prosperous and successful business man and that they and the corporations were engaged in negotiating many business transactions (actually non-existent or not being carried on in good faith) in which the persons to be defrauded might profitably participate, including the purchase of real estate from Sun Oil Company, the construction of a $14,000,000 dam in Haiti, and numerous others; that they used the Dade corporation as a front to incorporate and capitalize falsely the other two corporations, by means of two worthless checks for $250,000 and $25,000 respectively, drawn by Dade; that they by means of such scheme defrauded a Mrs. Fisler of a substantial sum of money (shown by the proof to be $40,000 to $76,000) in the Sun Oil Company real estate negotiations, of $3,000 by promising to buy her an automobile which they failed to do, of the proceeds of a valuable annuity contract by promising to turn the proceeds over to her, and of $900 by representing they would buy and resell coconuts, returning to her the proceeds; that they likewise defrauded X. G. Nichols of $10,000 by representing that he would be awarded the contract to build the Haitian dam which they pretended to be financing and to control; that they likewise defrauded Arnoldo Daetz-Villela of $3,500, by assuring him that if he would invest in bonds of the *Societe Nationale* he would be given an executive job therein with a substantial salary. Count one ended by alleging that in furtherance of this scheme, appellants mailed a letter to Sun Oil Company seeking an option on certain real estate.

Counts two through seven realleged the scheme to defraud by reference. Count two alleged the mailing of a letter and corporate charter to the Florida Secretary of State in furtherance of the scheme; count three, the mailing of Mrs. Fisler's annuity contract; count four, the taking from the mails of a check from Sun Oil Company to the Dade corporation; count five, the mailing of Dade's worthless check for use in incorporating the *Societe Nationale*; count six, the sending of a telegram for the purpose of selling stock; count seven, a long distance telephone call to sell *Societe Nationale* stock.

Count eight charged a conspiracy to violate the mail fraud statute and the fraudulent securities statute.

Appellants contend that this indictment is duplicitous; that is, it

**354**

shows on its face separate schemes to defraud in each substantive count, thereby prejudicing the defendants by wrongly stating several different crimes together as a single violation and letting the jury consider them as such. We recognize that each count of an indictment for violations of these statutory crimes may set out only a single scheme to defraud. We are convinced, however, that these counts state but a single scheme.

We said in Weiss v. United States, 5 Cir., 122 F.2d 675, 680:

"A single scheme to defraud may involve a multiplicity of ways and means of action and procedure. It may be such that the complete execution of it would involve the commission of more than one criminal offense. Mere details may be changed and the scheme remain the same. As the execution of the scheme (or the intention to devise the scheme) proceeds, new ways may be adopted or invented to effectuate the original design. The important thing is that the scheme, or the intention to devise it, shall remain the same."

In that case we held the defendants engaged in but a single scheme to defraud, by collusively and fraudulently raising the price of a public contract and then a year later collecting a claim for fictitious extra work. It does not appear that the defendants conceived the whole scheme from the start. In United States v. MacAlpine, 7 Cir., 129 F.2d 737, three different methods were used at diverse times by the defendants to defraud a large class of victims of their whiskey warehouse receipts. It was held that this was also one scheme.

The teaching of these cases as applied to the present one, is that the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme. Naturally, by clear analogy it does not make any difference that the various deceptions were practiced at different places. Nor is it significant that the whole scheme was not planned out in advance. A continuing "intention to devise it," as we said in the Weiss case, or an imperfectly conceived plan to defraud which becomes more and more sophisticated and grandiose as the plan progresses and the assets of the more gullible victims are exhausted, may well constitute a single scheme.

But the appellants contend that those cases are distinguishable, because in the Weiss case a single victim was taken in, and in the MacAlpine case a single type of document of title was sought from the victims. No such common thread runs through the fraudulent transactions charged in these counts, they say. But in our opinion, there were several common elements alleged in all these transactions, and as we shall explain more fully, these connecting elements are enough to make all the transactions charged parts of a single scheme. The most important common element was the representation that Owens was a prosperous and successful business man with great financial power and resources.

2. Since little more can be said on the subject of how many schemes were alleged and proved without referring to the evidence introduced, it is convenient at this point to proceed to a consideration of the second question—that is, whether the proof, in variance with the indictment, showed separate schemes—and of the testimony which appellants say showed there was a multiplicity of schemes.

That testimony showed that Owens met Mrs. Fisler in September, 1950, and that the Sun Oil Company real estate gambit was well under way, and the first letter was mailed, about September 30, 1950; but that neither appellant had heard of the possibilities in the Haitian banana and banking bubble, which lured on Nichols and Daetz-Villela, until some time after November 18, 1950. We do not agree that this shows separate schemes, for the reason stated above, that a scheme does not have to be conceived in its entirety from the outset. The evidence *did* show the appellants' fraudu-

lent activity was continuous over the entire period.

Appellants' contention that the Government proved multiple schemes was presented to us in its most subtle form upon the oral argument of this case. Counsel contended that the times, places, and means used in the different transactions were shown by the proof to be so dissimilar, that the only common elements were the deception and the intention to defraud; and therefore to hold that this was a single scheme would imply that any two entirely disconnected frauds by the same person were parts of a single scheme. However, we see a much closer interrelation among the transactions. It is well known that many swindlers have a characteristic *modus operandi* and that there are terminological, if not always juristic, distinctions among there techniques. Some operate simply by giving worthless checks; others are check "kiters"; still others are short change artists. Some specialize in impersonation; others in selling worthless securities and oil leases; some in the old racetrack swindle. To mention only by their unsavory names some other recurring devices used by confidence men, there are the Spanish prisoner, the bankroll on the sidewalk, the badger game and marked cards and loaded dice. The continuous and habitual use of any of these techniques even over a long period on numerous victims in many different places, in our opinion would normally constitute a single fraudulent scheme, the necessary unity deriving from the fact that the technique planned and used in each transaction is of the same general type. This, of course, is not to say that two or more of these general types of fraudulent conduct may not be combined in a single scheme.

Appellants' frauds here were continuous, and used the same general *modus operandi*. The jury could well conclude that the appellants set out to defraud anyone and everyone who could be tricked into believing that Owens was a powerful and clever magnate, and into parting with his money or property in return for some promise of benefit in connection with Owens' ventures. All of the transactions here fell into that general pattern. The fortune teller, the dinner at Gallagher's, the alleged romance, the corporations, the worthless checks, the dam contract, and the promised bank position were all incidentals to the plan calculated to suit each victim's appetite or credulity. This general similarity of technique is in our opinion enough to make these transactions all part of one scheme, but if that were not enough, there is still another common factor in these transactions. That is the part played by the Dade corporation (indirectly, to be sure) in defrauding all of the victims. Mrs. Fisler was completely taken in by Owens' talk of his "corporation's" negotiations for the Sun Oil Company land even before Dade corporation's ill-started birth; Nichols and Daetz-Villela were misled by the illusion of financial power of Dade's spurious offspring, the two Haitian corporations, nurtured by Dade's worthless checks.

We conclude that there is no merit in appellants' contention, involved in both of the first two questions, that there were two or more separate schemes. Nor is there anything contrary to this conclusion in Bozel v. United States, 6 Cir., 139 F.2d 153, certiorari denied 321 U.S. 800, 64 S.Ct. 937, 88 L.Ed. 1087.

3. As for the third question, there was ample evidence for the jury to find that the facts were exactly as the respective charges alleged, and that appellants never intended a legitimate transaction with Sun Oil Company as they maintain. As for Cogdill's connection, the evidence shows that he knew of Owens' previous shady operations, in one of which he had lost $4,000 himself, knew that the Dade corporation's stock was issued without any value given by himself or Owens, and knew that the Dade corporation's bank account had only around $100 in it when he drew and mailed to Haiti the checks totalling $275,-000. His secretary testified that Cogdill told her practically at the beginning of

the scheme, that he thought Owens was afraid she "was going to let the cat out of the bag" to Mrs. Fisler when the secretary got her signature on a $76,000 check. The jury could therefore certainly find that Cogdill was implicated before the date the first offense charged was committed and remained in the scheme until its conclusion.

■ Even if we thought, as we do not, that the indictment was technically duplicitous or the proof technically at variance with it, we would nevertheless be obliged to affirm because the evidence was such that we see no way in which these supposed errors might have substantially prejudiced appellants. Prejudice may arise in such case when charges against one defendant are tried together with charges made against others with whom they were not joined in any conspiracy, as in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, where eight separate conspiracies were proved under an indictment alleging a single conspiracy. The distinction between that case and Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, appears to be one of degree. See 328 U.S. 750, 766, 66 S.Ct. 1239, 1248. The Court said in the Kotteakos case, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248:

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

In Baker v. United States, 5 Cir., 156 F.2d 386, Chief Judge Hutcheson, speaking for this court pointed out that in a state of facts similar to those involved here, there was no substantial prejudice shown under the Kotteakos and Berger cases.

We are convinced that any supposed error in this case had such slight effect on the jury (the evidence showing plainly that if there were separate schemes, they were intimately connected and that both appellants contributed material efforts to defraud each victim) that no substantial rights of appellants were affected. Federal Rules of Criminal Procedure, rule 52(a), 18 U.S.C.A.

The judgments are therefore

Affirmed.