Carl WHITSON d/b/a Allen Mfg. Company, Plaintiff-Appellee,

v.

AURORA IRON & METAL CO., an Illinois corporation, Defendant-Appellant.

No. 13422.

United States Court of Appeals
Seventh Circuit.

Dec. 14, 1961.

Maurice Rosenfield, Harold Stickler, Chicago, Ill., for appellant.

Bert Barefoot, Jr., Oklahoma City, Okl., Barefoot, Moler & Bohanon, formerly Bohanon & Barefoot, Oklahoma City, Okl., of counsel, for appellee.

Before HASTINGS, Chief Judge, and DUFFY and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

Carl Whitson, doing business as Allen Mfg. Co., plaintiff-appellee, brought this diversity action in the District Court against Aurora Iron & Metal Co., Inc., defendant-appellant, to recover, with interest, a balance allegedly due under a contract for the manufacture of a baling press and its installation on defendant's premises. Defendant's answer, among other things, counterclaimed for damages based on alleged breach of warranties and alleged fraudulent misrepresentations of the plaintiff in procuring the contract. The case was tried without a jury. The District Court, after making and entering detailed findings of fact and its conclusions of law, and overruling defendant's post-trial motions for a new trial and to amend the findings, conclusions, and judgment, entered a judgment order in favor of plaintiff for $48,000.00 (the amount of the two $24,000.00 contract installment payments allegedly remaining due) with interest at 5 per cent per annum from December 15, 1958 to the date of judgment, and with interest thereafter at the same rate until paid, together with costs. Defendant appealed.

The defendant's appeal is premised on contentions that the court's findings of fact are against the manifest weight of the evidence, its conclusions of law erroneous, and that the court erred in rulings admitting and excluding evidence.

From our examination of the record we conceive the main contested issues presented by plaintiff's appeal to be:

(1) Whether the findings of fact are inadequate or clearly erroneous.

(2) Whether rulings on the admission or exclusion of testimony resulted in reversible error.

Plaintiff in early 1958 was the owner of a manufacturing and assembly plant in Seminole, Oklahoma, engaged in the construction of baling machines or presses designed to compress automobile bodies, tin and sheet iron into compact bales. Defendant operates a scrap iron and metal business at Aurora, Illinois, and in March 1958 was desirous of purchasing a press or baler capable of compressing automobile bodies. Defendant saw an advertisement of plaintiff's describing his balers, made inquiry to plaintiff, and after being called on by plaintiff's representative, visited the Seminole plant where a contract was entered into for the manufacture of a baler and its installation at defendant's Aurora scrap yard.

The written contract specified that the baling press was to be equipped with a complete hydraulic system consisting of three 100 horsepower electric motors, plus one 7½ horsepower electric motor, and six Denison TMG8 pumps connected to the motors, plus one pilot and circulating pump. The hydraulic system was to be of 2000 pounds per square inch oil pressure. Manufacture of the baler was to be completed within 190 days from March 19, 1958, ready for loading, and completely installed within 60 working days from arrival on the railroad siding at defendant's yard. Defendant was to provide and connect the outside electrical wiring and meter box. The agreement recited that:

"The baler to be put in good operating condition on owners [defendant's] property or yard; and fully guaranteed to bale full automobiles less motors, and tin and sheet iron of any kind. * * *"

The price stipulated was $125,000.00 payable in accordance with a schedule which provided for payment of the last two installments as follows:

"The sixth payment is due in the sum of $24,000.00 when the press is

fully installed, tested and working in good condition within thirty days.

"The seventh and final payment is due in the sum of $24,000.00 sixty days after sixth payment. * * *"

The manufacture of the machine was nearing completion in August 1958 and Shelby Pielet, the officer of defendant who had executed the contract on its behalf, saw the baler demonstrated at the Seminole plant. Although defendant was in arrears on its scheduled payments the plaintiff, at defendant's request, shipped the baler and it arrived at the Aurora yard on or about October 5, 1958. By late October or early November plaintiff's crew had completed work on the installation of the baler at defendant's yard but the defendant had not installed the outside electrical wiring necessary to its operation. Plaintiff's mechanic, Love, who was to fill the oil tank and make the hookups and final adjustments, returned to Oklahoma with the crew, but with the expectation of coming back when defendant completed the outside wiring.[1] The outside wiring was completed about ten days later[2] but Love, because of the hospitalization of his wife did not return at once, and it was indicated that it might be several days before he would return. Defendant was anxious to commence baling operations with the machine and unwilling to wait until Love's return to put it in operation. It procured the services of Redman, a sales engineer for a Chicago firm which was sales representative of the manufacturer-supplier of the valves used in the baler's hydraulic system, to make the final adjustments on the valves to put the baler in operation.

But Redman first recommended and defendant, over plaintiff's protests, made various and substantial changes in the hydraulic system. Plaintiff immediately sought and obtained confirmation of the system, as furnished and installed, from the Hydraulic Press Company, the manufacturer-supplier of the valves, who had furnished the schematic for the hydraulic system, but the changes had been made in the interim.

Redman did not get the machine to operate until Love returned and made certain adjustments, and then it did not operate satisfactorily. It was not until Love made further adjustments and reinstalled steel tubing Redman had replaced with copper that the press operated to satisfactorily bale a number of car bodies into good, tight bales. A pump shaft which broke in early December was replaced by plaintiff prior to December 15, 1958. In late January or early February 1959 plaintiff replaced a valve with one of different type on defendant's complaint. In the latter part of February 1959 defendant employed Redman and Zilske, another sales engineer, to make recommendations as to alterations or changes. Subsequently the press was repaired and remodeled by defendant and thereafter was operative and productive on a sustained basis at the rate of 12 tons per hour.

Defendant did not complete the fifth payment until December 3, 1958 although, under the contract payment schedule, it was due in early October when the machine arrived at Aurora for installation. The sixth and seventh payments were not made. During the period prior to February 12, 1959 defendant incurred expenditures totalling $998.55 for labor and materials in connection with work done on the baler which plaintiff authorized to be done at his expense. There was testimony that costs incurred by defendant for repairs and remodeling of the baler, including charges for supervision of the work by Shelby Pielet, together with the estimated cost of work yet to be done on the rejector and to re-

1. Under the contract plaintiff had 60 "working" days after the baler's arrival to complete the installation at the site. Thus plaintiff was not under obligation to turn over the machine in working order before December 15, 1958.

2. The delay caused by defendant entitled plaintiff to an extension to at least December 25, 1958.

build the lid, which was bowed, totalled $24,038.33.[3]

The District Court concluded that any failure of the baler to operate in the manner contemplated by the contract, and the expense incurred for repairs or changes, were occasioned by defendant's own conduct and its abuse of the baler. There is conflict in the testimony as to the causative factors. But there is testimony that the malfunctioning of the baler when it was first placed in operation was the result of changes the defendant had made in the hydraulic system on Redman's advice and over plaintiff's opposition, and that the later repairs and replacements, including those recommended by Redman and Zilske in the latter part of February 1959, were the result of misuse of the baler, such as its operation at pressures in excess of the 2000 pounds per square inch for which it was designed, the baling of two automobile bodies at a time, and the baling of steel clips, a metal product for which it was not designed.[4] And this testimony is not without supporting inferences arising from other evidence. The conclusions of the District Court on this phase of the case are supported by adequate findings which, on the record before us, we cannot say are clearly erroneous. It is not our function, as a court of review, to weigh the evidence, as defendant seems to urge. The trial court's findings have substantial support in the record and, in this connection, we are required to give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 52(a), Federal Rules of Civil Procedure (28 U.S.C.A.).

And these same considerations apply to the remaining aspects of the case in so far as factual issues are concerned. ■ On the basis of the facts found by the District Court, and supported by the record, the baler was built and installed in conformity with the specifications of the written agreement and would have been turned over in good operating condition within the period fixed by the contract except for defendant's interference through Redman. And after the initial difficulty caused by Redman's changes was corrected by plaintiff the press did "bale full automobiles less motors" as guaranteed.

Defendant's claim of breach of warranties includes assertion as warranties certain statements of plaintiff, also claimed to constitute false and fraudulent misrepresentations, made prior to execution of the written agreement and not incorporated therein. These statements can be aptly characterized as "puffing" sales talk and we do not regard them as factors meriting other or further consideration. Except for the statements above mentioned the warranties claimed breached are an implied warranty of fitness of the baler for the purpose intended, an alleged warranty that the baler would have a productive capacity of from 30 to 50 tons per hour, and the express warranty of the agreement that the baler would be put "in good operating condition" in defendant's yard and would "bale full automobiles less motors, and tin and sheet iron of any kind".

From what we have already said it is apparent that the findings of the District Court, supported by the record, dispose of the contention that the express warranties of the agreement, above quoted, were breached. These same findings negate a conclusion that there was any breach of an implied warranty of fitness of the baler for the purpose it was intended.

An examination of the written agreement reveals no express warranty that the baler would have a stated ton per

---

3. In defendant's brief it is stated that "defendant has incurred costs and expenses of $998.55 upon authority of plaintiff, plus a total of $23,039.78 to make the press productive and operative." It therefore appears that the $998.55 is included in the $24,038.33 total shown in Defendant's Exhibit 31 and represents the items listed therein under dates from November 6, 1958 to February 12, 1959 inclusive, paid for by defendant.

4. The contract called for a baler guaranteed to bale "automobiles less motors, and tin and sheet iron of any kind".

hour capacity. The record does disclose that plaintiff did advertise a baler equipped with *four* 100 horsepower electric motors and *eight* vane type pumps with 550 gallons per minute capacity. It was designed to operate at a pressure of *3000* pounds per square inch. And it was represented as capable of baling 30 to 50 tons per hour. An offer plaintiff made to defendant to supply such a baler, conditioned on immediate acceptance, was withdrawn by letter under date of March 6, 1958 for lack of acceptance. Subsequent negotiations culminated in the written agreement of March 19, 1958 which expressly specifies a baler having but *three* such motors, only *6* pumps, and to operate at *2000* pounds per square inch pressure. And the contract price of $125,000.00 was substantially less than that of the 3000 pound per square inch baler. Moreover, the record shows that at the time the contract was executed defendant had knowledge that the price of a comparable baler with a 15 to 20 ton per hour productive capacity, manufactured by another press company, was between $215,000.00 and $240,000.00, and knew that the price of a 30 to 50 ton per hour baler was $425,000.00. Shelby Pielet testified that defendant "didn't need that big a capacity".

On the basis of the record before us we are of the opinion that the specific findings made by the trial court negate the claim of false and fraudulent misrepresentations. And here, the absence of clear and convincing evidence to support an affirmative finding of such misconduct precludes variance of or addition to the terms of the written agreement by parol evidence. Cf. Goldstein v. Welded Products Co., 196 Okl. 219, 164 P.2d 229.[5] We conclude that the trial court did not err in not finding a breach of a warranty that the baler contracted for would have a productive capacity of from 30 to 50 tons per hour.

Defendant's additional claim of fraud in the procurement of the written agreement lacks the clear and convincing evidentiary support such a charge requires. In addition to the factors already discussed and disposed of in connection with the question of warranties, defendant's charge of false and fraudulent inducements in procuring the contract is bottomed on the fact that plaintiff prepared the contract document and assured defendant that it protected defendant's rights and "covers everything". But the record shows that Shelby Pielet was not satisfied with the agreement as initially prepared by plaintiff; that changes were made at his suggestion. And the final draft, which became the executed agreement, was prepared in Pielet's presence. Pielet was no stranger to hydraulic pressure balers, their use, and their capacity differentials. The record reflects no facts or circumstances which would make defendant's reliance on plaintiff's legal training in the drafting of the contract a basis for a finding of fraud or overreaching.

Intertwined with defendant's arguments in support of its claim of breach of warranties is a contention that there is ambiguity in the payment schedule provision concerning the sixth payment which opens the door to parol or extrinsic evidence on the subject. We are not impressed with this contention of defendant. The provision concerning the sixth payment reads:

> "The sixth payment is due in the sum of $24,000.00 when the press is fully installed, tested and working in good condition within thirty days."

Provisions relating to other payments which permitted their delay from a specified event all provided that payment be made a stated number of days *from* the specified event. In this context we conclude that the "within thirty days" expression as used in the provision quoted

---

5. There is no dispute that the controlling principles of Illinois and Oklahoma law are in agreement with respect to those issues of the appeal governed by state law. Each party cites and relies upon decisions from both states. The contract involved was made in Oklahoma and was to be partly performed there and completed in Illinois.

has the meaning of "within thirty days thereafter", i. e. that the sixth payment becomes due on the thirtieth day after the baler is fully installed, tested and working in good condition. And, if it be assumed for the purpose of argument, that, as defendant 'claims, the provision could be subject to the construction that defendant was to have a thirty day period of sustained productive operation of the machine in good working condition before the sixth payment was to be due such interpretation would not afford a basis for any claim that the production was to be at 30 to 50 tons per hour or for excusing defendant's interference with the hydraulic system.

We find no merit in defendant's assertion of error in the admission and exclusion of testimony. It is addressed to the trial court's rulings permitting plaintiff to testify concerning the necessity for the remodeling and repair work defendant undertook to have performed on the baler and the reasonableness of the expenditures claimed therefor, and rejecting Pielet's proffered testimony as to conversations with plaintiff relied upon as evidencing that the defendant's refusal to pay was not an unreasonable and vexatious delay of payment. Plaintiff's familiarity with hydraulic systems and experience as a builder of balers, shown by the record, qualifies him as competent to testify on the subject of the necessity for the remodeling and repairs and the reasonableness of the claimed costs. And Pielet's proffered testimony was properly rejected as relating to his subjective feelings and conclusions and his interpretation of the contract provisions. Moreover, it was not material or relevant on the question of interest. No finding of unreasonable and vexatious delay is required here. The contract fixes the due date and amount of each payment to be made.[6]

The District Court found in substance that the repairs authorized prior to February 12, 1959 by plaintiff to be made at his expense were primarily occasioned because of his desire to do anything he could to bring about payment of the balance of the contract price and not because of any admission on his part that the repairs were either necessary or caused by some factor which legally obligated him to make them. But whatever his motive the plaintiff expressly authorized defendant to make expenditures on the press totalling $998.55 at plaintiff's expense. And defendant did so. On oral argument counsel for plaintiff was unable to point to anything in the record to indicate that defendant had taken and received credit for any of this amount in connection with remittances on the fifth payment although counsel inferred that some $400.00 or $500.00 of the amount may have been the subject of such prior credits. However, we are under no obligation to search the voluminous record in an attempt to ascertain what, if anything, it might reveal in this connection nor are we disposed to undertake such task. It is our opinion that on the undisputed facts concerning these particular expenditures the plaintiff is liable therefor, and that in the posture in which the matter rests defendant is entitled to credit in that amount on the sixth payment.

The District Court in awarding statutory interest on the overdue balance of the contract price apparently concluded, in keeping with its findings that because of defendant's own delay in installation of the outside wiring and defendant's subsequent interference with the hydraulic system and its consequences, the plaintiff's duty to fully install the baler in good working condition was discharged by at least mid-November of 1958 and the thirty day period for payment of the sixth installment terminated

---

6. The Illinois statute (Ill.Rev.Stat.1957, ch. 74, § 2) provides in pertinent part: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any * * * instrument of writing; * * *."

December 15, 1958. We cannot say that such conclusion embraces error either in fact or law. The dates in the record testimony are often stated as approximations. Although our calculation would justify a somewhat earlier termination of the thirty day period the December 15th date is within the range of the periods mentioned in the testimony. The District Court, however, apparently overlooked that it was only the sixth payment in the amount of $24,000.00 that was due at the expiration of the thirty day period and that the seventh payment, in an equal amount, was not due until sixty days after the sixth payment, i. e. sixty days from the December 15, 1958 date. Consequently, the court erred in allowing interest on the full $48,000.00 from December 15, 1958 to the date of judgment.

In view of the position we have adopted with respect to the issues discussed we do not find it necessary to comment in detail on other arguments advanced by the defendant nor to make specific analysis of the cases cited in connection with such contentions. We have, however, in arriving at the disposition we make of the case considered each of the arguments advanced and the authorities relied upon in support thereof.

It is our conclusion that the judgment order of the District Court should be affirmed in all respects except insofar as it fails to allow the $998.55 credit against the sixth payment and to defer pre-judgment interest on the $24,000.00 amount of the seventh payment until February 15, 1959. The cause is therefor remanded to the District Court with instructions that its judgment order be modified by reducing the principal amount thereof to $47,001.45, together with interest at the rate of 5% per annum on $23,001.45 from December 15, 1958 to date of judgment; interest at the rate of 5% per annum on $24,000.00 from February 15, 1959 to date of judgment; and with interest thereafter at 5% per annum until paid.

No allowance of costs in this Court is made to either party.

Remanded with instructions to modify judgment order.