UNITED STATES of America,
Plaintiff-Appellee,

v.

Earl BUSH, Defendant-Appellant.

No. 74–1969.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1975.

Decided Sept. 4, 1975.

Michael W. Coffield, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Gary L. Starkman, Ann C. Tighe, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SPRECHER and BAUER, Circuit Judges, and EAST, Senior District Judge.*

BAUER, Circuit Judge.

Defendant-appellant, Earl Bush, was charged in an eleven count indictment with violations of the mail fraud statute, 18 U.S.C. § 1341.[1] Following a jury trial, Bush was convicted on all counts. The trial judge imposed concurrent one year terms of incarceration upon each count.

---

* The Honorable William G. East, Senior District Judge, District of Oregon, is sitting by designation.

1. 18 U.S.C. § 1341, states, *inter alia* :

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Services, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

Earl Bush served as Press Secretary and Director of Public Relations for Mayor Richard J. Daley from 1955 to 1973. During that period he was also the owner of Dell Airport Advertising, Inc. ("DAAI"), which held the exclusive contract with the City of Chicago for display advertising at Chicago's O'Hare International Airport.

Essentially, the indictment alleged that Bush, as owner of DAAI at the time he was employed by the City of Chicago, engaged in a scheme to deprive the citizens of Chicago, its mayor, officials and employees, of his loyal and faithful services as a city employee, the honest administration of the city's business, and information material to the decisions which the city's officials were required to make in conducting the city's business. The indictment also charged that Bush schemed to obtain money, property and other things of value by false representations.

The primary thrust of Bush's appeal to this Court is that by a misapplication of the mail fraud statute and erroneous jury instructions, he believes he was improperly and unfairly convicted of a noncrime. In order to consider arguments by both sides dealing with the applicability of the mail fraud statute we must carefully review the factual record.

In the latter part of 1961 and early 1962, a new terminal, runways and other facilities were under construction at O'Hare Field, which was to be Chicago's first jet airport. To facilitate the completion and the opening of the airport, Mayor Daley established a small informal committee to negotiate contracts for the concessions operations at O'Hare. The committee consisted of John Duba, Deputy Mayor, William Downes, Commissioner of Aviation, and John Melaniphy, Corporation Counsel. Although not formally appointed, John Duba was assumed to be the committee's chairman.

In 1961 Bush's company [2] entered into a joint venture agreement with Dell Displays, Inc.[3] for the negotiation and service of an airport advertising contract with the City of Chicago. The joint venture agreement provided that John and Robert Dell would do the advertising work at O'Hare Airport and that Bush's company (DAAI) would hold the contract with the city. The services Bush performed were minimal. Although he originally developed the advertising concept of a three-dimensional shadow box display case, the idea on which the contract was based, the Dells were to design the displays, sell them and find locations for them in the airport. The Dells assumed that Bush's contribution, in addition to the originating of the shadow box design, would be to promote the contract.[4]

In the fall of 1961, as preparations were being made to submit a proposal to the City of Chicago for the display advertising concession at O'Hare, Bush had a conversation with Robert Dell concerning the use of his name in seeking the contract. Bush told Dell that his (Bush's) name should never be used in connection with any work regarding the airport contract. Subsequently, Bush introduced Robert Dell to William Downes, the Commissioner of Aviation. Neither at the time of the introduction nor at any later date did Bush advise Downes of his substantial interest in the advertising contract at the airport. When the formal proposal for the O'Hare advertising contract was submitted to the City of Chicago there was no mention or disclosure of Bush's interest in the contract.

Prior to the time that the display advertising concession contract for O'Hare

---

2. At this time Bush's company was known as Terminal Art, Inc. DAAI was the successor corporation to Terminal Art, Inc.

3. Dell Displays, Inc. was owned by John and Robert Dell.

4. The defendant contends that it is a misstatement of the evidence to take the position that

it was Bush's responsibility to promote the contract. We have reviewed the record very closely on this point and believe that the jury could have properly reached that conclusion, especially in light of Dell's testimony at p. 118–9 of the trial transcript.

was to be awarded, Bush several times spoke to John Duba, the Deputy Mayor and the informal chairman of the committee responsible for evaluating and awarding the O'Hare concession contracts, concerning the DAAI proposal. The first conversation between Duba and Bush regarding DAAI occurred in the summer or fall of 1961. At that time, Bush told Duba that DAAI was a reliable firm in the field of display advertising, that it was capable of carrying out a display advertising program at O'Hare, and that it was experienced in preparing displays. Two other similar conversations occurred during the summer or fall of 1961. At no time did Bush disclose to Duba that he had any interest in DAAI.

Late in 1961, Duba recommended to Mayor Daley that DAAI be awarded the display advertising contract at O'Hare. In making that recommendation, Duba considered DAAI's experience, the aesthetics of the proposed displays, the fact that DAAI was a local company, the amount of money that DAAI guaranteed to the city and the fact that Bush had recommended DAAI. Duba placed great weight on Bush's recommendation because of Bush's expertise in the field of public relations and advertising. In giving the recommendation, however, Bush did not specifically request that the contract be awarded to DAAI or ask for any special treatment.

Following Duba's recommendation to the mayor, William Downes, the Aviation Commissioner, recommended to the Chicago City Council that DAAI be awarded the O'Hare display advertising contract. On November 1, 1961, the City Council approved the awarding of the contract to DAAI.

In 1966, DAAI's contract with the City of Chicago expired. However, it was renewed on October 4, 1967 after renewal was recommended by the mayor and the commissioner of aviation. Prior to the renewal of the contract, however, Bush met with Commissioner Downes at O'Hare in approximately July, 1966. At that meeting, Bush and Downes dis-

cussed the appropriateness of placing an automobile display at a certain location in the airport terminal. Downes asked Bush for his judgment concerning the display. Bush responded that he thought the automobile display was a good idea, that it would make the location where it was to be placed more attractive, and that it probably would be good revenue producer. Bush also stated, "But I have no ideas [sic] of telling you this is good because it is a revenue producer, because I have no connection whatsoever with the company."

Between the time the city awarded the display advertising contract to DAAI in 1962 and the time the contract was renewed in 1967, Bush received $40,000 from DAAI. None of that money, however, went directly to him. Rather, DAAI checks, the proceeds of which were intended for Bush, were made payable to Information Consultants. The checks were sent to Arnie Matanky, a friend of Bush's who owned Information Consultants; and Matanky deposited each check in the Information Consultants' bank account. For each DAAI check received and deposited, Matanky would make out an Information Consultants' check payable to Earl Bush in the same amount as the DAAI check. Information Consultants never did any work or performed any services for DAAI and it never retained any of the money it received from DAAI. All of the money received was passed on to Bush.

As of approximately June, 1966, Bush's DAAI stock was still being held in the names of nominees. Sometime between June and September, 1966, Bush's attorney advised him that the stock should no longer be held by nominees. Bush responded that he knew the stock was being held by nominees and did not want it registered in his own name. On advice of legal counsel, Bush decided to establish a trust, and, on February 22, 1967, Bush's DAAI stock was transferred to Sebat Co., the nominee for Sears Bank & Trust Company. Bush was the settlor and income beneficiary

of the trust and Sears Bank & Trust Company was the trustee. Bush had complete control over the transactions of the trust.

Shortly after the creation of the trust, DAAI, for the first time, began to pay dividends to Bush, its sole shareholder. The first dividend was paid in July, 1967. As with the earlier monies sent to Bush by DAAI, the proceeds of the DAAI dividend checks reached Bush by circuitous means. Thus, DAAI sent its dividend checks, made payable to Sebat Co., to Bush's attorney, Sidney Drury. Without making any bookkeeping entries or otherwise processing each check, Drury would then transmit each check to John Carbery, vice-president and trust officer at the Sears Bank & Trust Company. Each check so received by Carbery was then deposited into Bush's trust account. Between July, 1967, when DAAI first began paying dividends, and July, 1973, Bush received $162,000 from DAAI.

From the inception of his tenure as Mayor, Richard Daley established and disseminated to department heads and members of his staff, including Bush, certain standards of conduct. One of these standards was that every department head and staff member was prohibited from using his position as an employee of the City of Chicago to benefit personally. To emphasize this policy, Mayor Daley in 1972 required that all of his department heads and staff members who were required by law to file statements of economic interests with the Cook County Clerk file copies of such statements with the Mayor's Office. Bush was required by law, both in 1972 and 1973, to file statements of economic interests with the Clerk of Cook County[5] Accordingly, he fell within those covered by the mayor's policy and, thus, was required to file copies of his interest statements with the Mayor's Office.

In June, 1972, Bush typed or caused to be typed a statement of economic interests. On that form, the word "none" was set forth in the places which called for disclosure of Bush's stock holdings in DAAI. Bush signed the statement and had it notarized. He then photocopied or otherwise duplicated that statement. Subsequently, Bush erased the words "none" which had been typed on the statement and in their place typed on a different typewriter the words "Dell Airport Advertising" and "stock." On June 29, 1972, Bush filed the altered document, which disclosed his DAAI interests, with the Office of the Cook County Clerk. He filed the photocopied or duplicated copy, which failed to disclose his DAAI interests, with the Mayor's Office.

On April 11, 1973, Bush filed a second statement of economic interests with the County Clerk's Office. Original typing appeared on the statement and in it Bush disclosed his DAAI interests. Bush also filed a statement of economic interests with the Mayor's Office, but that statement was not a copy or exact duplicate of the statement which he had filed with the County Clerk. Rather, it contained original typewriting and set forth the word "none" where "Dell Airport Advertising, Inc." and "stock" should have appeared. The typewriter which had been used to prepare the two 1973 statements was the same typewriter which had been used to type the alterations on Bush's 1972 statement.

In July, 1973, Mayor Daley met with Bush at City Hall. Mayor Daley had requested the meeting because he had read or heard of newspaper disclosures concerning Bush's ownership of DAAI. At that meeting Daley asked Bush

5. 127 Ill.Rev.Stat. § 604A–101 (Supp.1973) provides, *inter alia*:

"The following persons shall file verified written statements of economic interests, as provided in this Article:
(i) Persons who are employed . . . by any unit of local government as defined by the Illinois Constitution, and are compensated for services as employees and not independent contractors at the rate of $20,000 per year or more . . .."

whether there was any truth to the newspaper charges. After Bush admitted that the allegations were true, Daley dismissed him. Subsequently, when Mayor Daley testified that Earl Bush had served him for over twenty years to the best of his ability, he stated "he was a very fine employee." He further testified that the city still maintains the advertising contract with DAAI because the service from the display people and the compensation to the city was the best that any aviation facility has received in the United States.

## I. DID THE DEFENDANT'S CONDUCT AMOUNT TO AN OFFENSE UNDER THE MAIL FRAUD STATUTE?

Defendant asserts that the mail fraud statute has no real application to the facts of this case; and, further, that no judicial authority has ever gone this far in extending the mail fraud statute. We agree that defendant Bush's conduct was not the typical scenario found in a mail fraud case. However, we remain convinced that the government did meet the mandate of the statute by demonstrating that Bush engaged in a scheme to defraud the mayor and the citizens of Chicago and that he used the mails in the furtherance of that scheme, and furthermore, that Bush had a specific intent to engage in the fraud.

In recent years in this Circuit and across the country it has become well established that the mail fraud statute is violated when some or all of the following factors are present: a duty to disclose an interest with a concomitant failure to do so; an attempt to cover-up through false pretenses; a taking of money or property or rights of another through the use of kickbacks, extortion, bribery, tax evasion, perjury, or a violation of some state or federal statute; a use of the United States mails. See *United States v. Proctor & Gamble Co.*,

47 F.Supp. 676 (D.Mass.1942); *United States v. Faser*, 303 F.Supp. 380 (E.D.La. 1969); *United States v. George*, 477 F.2d 508 (7th Cir.), *cert. denied* 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974); *United States v. Barrett*, 505 F.2d 1091 (7th Cir.), *cert. denied* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *United States v. Bryza*, 522 F.2d 414 (7th Cir., decided August 25, 1975). What makes this case so difficult is perhaps the subtlety of the scheme in which Bush was engaged. There is no concrete evidence of extortion, bribery, kickbacks, or a violation of any criminal law [6] other than the mail fraud statute. The totality of Bush's actions show that he did violate federal law and throughout the years he was engaged in a conscious effort to hide his activities.

Because of the multifaceted nature of the transactions the indictment was couched in language which charged that Bush engaged in a scheme to both defraud and to obtain money under false pretenses. Reduced to its essentials the indictment alleged that Bush defrauded the citizens of Chicago, the mayor, and the employees and officials of the city out of (1) their right to Bush's loyal and faithful services in his official capacity, (2) their right to have the city's business conducted honestly and impartially, and (3) their right to be aware of all pertinent facts when analyzing, negotiating, entering into and renewing contracts with persons and companies seeking to do business with the city; and, that as a result of this scheme, Bush obtained money and property in violation of § 1341 because through fraudulent pretenses he was able to collect his salary from the city and his profits from DAAI at the same time. We think the record amply demonstrates that Bush commit-

---

**6.** We note, however, that a conviction for mail fraud is not dependent upon a violation of state law. *United States v. States*, 488 F.2d 761, 767 (8th Cir. 1973), *cert. denied* 417 U.S. 909 and 950, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974); *United States v. Edwards*, 458 F.2d 875, 880 (5th Cir.), *cert. denied* 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972).

ted the acts alleged in the indictment. The result is that this case presents a hybrid situation linking some of the pure business fraud aspects of *United States v. George, supra*, with the use of public office for profit considerations of *United States v. Isaacs, supra* and *United States v. Barrett, supra*. The government and the defendant are locked in dispute over whether these precedents apply. A review of the cases does not indicate any previous factual situation which is squarely on point. *United States v. George, supra*, is perhaps the decision that is most apropos to the Bush case.

In *George* three defendants were indicted for mail fraud violations arising from a scheme in which Yonan, a buyer for Zenith Radio Corporation, received kickbacks from Greensphan, a supplier, through middle man George. The indictment charged that the scheme deprived Zenith of its lawful money and property and of the honest and faithful performance of its employee Yonan's duties.

Similarly in this case the indictment charged that one of the objects of the scheme was to deprive the City of Chicago, its mayor, officials and employees of the opportunity to bargain with all relevant facts in their possession. *George* fully recognized that such an allegation was sufficient to state an offense under § 1341:

"Not only did Yonan secretly profit from his agency, but also he deprived Zenith of material knowledge that Greensphan would accept less profit. There was a very real and tangible harm to Zenith in losing the discount or losing the opportunity to bargain with a most relevant fact before it."

However, the defendant correctly points out that the *George* case involved more than a mere breach of a fiduciary duty or mere nondisclosure of a business interest. Critical factors cited were the employee's participation in the scheme in his employment capacity, and/or the existence of a duty to disclose imposed by statutory or similar law and a breach of

such duty. Defendant reminds us of the warning in the *George* opinion that:

"We need not accept the Government's far-ranging argument that anytime an agent secretly profits from his agency he has committed a criminal fraud. Not every breach of every fiduciary duty works a criminal fraud."

■ But we think that Bush did more than breach his fiduciary duty; he materially misrepresented his interests.

Bush was not making his recommendation merely as a disinterested public servant. His ownership of DAAI was material to the city officials' evaluation of Bush's opinion of the company which he was recommending. Moreover, as the trial judge observed in ruling on Bush's motion to dismiss the indictment, Bush's "statement that the company was 'reputable' without disclosing that it was the device by which the Mayor's Press Secretary secretly derived profits from a city contract was itself a material misrepresentation."

The information that Bush owned DAAI and would receive profits as a result of DAAI's city contract was information material to those city officials who were to evaluate and recommend a proposed contract and to those in the City Council who were to award a contract. That information was material to a decision as to whether to award the contract to DAAI and, if so, at what price. Assuming that the city would have been willing to do business with a company owned by Bush, the fact that Bush would be receiving profits as a result of the contract was material to the question of what percentage of DAAI's profits should be turned over to the city.

Bush was not responsible for awarding the O'Hare advertising contract, but he used his official position within the mayor's inner circle to exert the substantial influence which he had on those who were responsible for negotiating the contract. He did so without advising them that he was vitally interested in the contract or that his sole responsibility under the terms of the contract was to promote

it. After the contract was awarded, Bush took steps to insure that the proceeds of the venture could not be traced to him, misrepresented his interest to assist in assuring that the contract would be renewed and filed false documents to continue his employment.

Bush's breach of fiduciary duty is important, however, in considering whether he deprived the city of his honest and faithful services. We believe that the mayor, the city, and most importantly, the citizens were deprived of those services. However, this alone could never be considered a crime under the mail fraud statute. It is only when his failure to provide honest and faithful services is combined with his material misrepresentations to the mayor and John Duba and his active concealment that an illegal fraud occurs which is cognizable under § 1341.

Much was said at trial about the fact that the city did not lose money on the contract and that it was one of the best in the country. However, that argument is not convincing. First of all, if the city had known of Bush's interest it might have been able to obtain a better contract. Secondly, the mail fraud statute seeks to prohibit fraudulent conduct regardless of ultimate loss or damage to the victims of the crime. *United States v. Reicin*, 497 F.2d 563 (7th Cir.), *cert. denied* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). Since 1961 Bush made a profit of over $200,000 from his hidden interest in the airport advertising contract. If the citizens of Chicago and other public officials had known of Bush's interest they could have rightfully negotiated an advertising contract which might have earned those profits for the city. The net result was that Bush, through his scheme, made a deal with the city by which the city profited. The deal may have been a good one for the city; the problem is that Bush deprived the city and its officials of making a better deal, of the best deal possible, in order that he might share in the profits. In *United States v. Barrett, supra*, this Court discussed this problem

and viewed its prior opinion in *United States v. George, supra*, as controlling, stating that:

"Despite the facts that the kickbacks did not 'come out of Zenith's pockets,' that the purchasing agent did not request any preferential treatment for the supplier, that the supplier was not given any preferential treatment beyond receiving the cabinet business, that the supplier's prices to Zenith were fair and reasonable and within Zenith's general guidelines for its suppliers' prices, that Zenith was never shown to be dissatisfied with the cabinet suppliers' products or prices, and that the purchasing agent insisted on efficiency and quality from the supplier, nevertheless this court affirmed the conviction of the purchasing agent, supplier, and the third party under the mail fraud statute."

We need not express any opinion here on whether the mail fraud statute can be violated unless the victim(s) suffer some form of pecuniary injury, because we believe that the city in this case did suffer pecuniary injury.

In his argument that the mail fraud statute has no application to the facts of this case, defendant Bush also contends that the government totally failed to prove that Earl Bush had the requisite intent to commit criminal fraud. Mail fraud, like all other crimes arising out of deceit or deception, requires a specific criminal intent. The mail fraud statute proscribes any scheme utilizing the mails that is "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir. 1965). See also *United States v. Shavin*, 287 F.2d 647, 650 (7th Cir. 1961), *cert. denied* 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 273 (1963); *Silverman v. United States*, 213 F.2d 405, 407 (5th Cir., *cert. denied* 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653 (1954). Did Bush have the requisite intent to deceive persons of ordinary prudence and comprehension? We think he did. In fact there is evidence in the

record that the mayor and members of the City Council were deceived. Indeed, Bush's course of conduct contained active steps to deceive. At trial explanations were offered for Bush's misrepresentations, his failure to disclose his interest in DAAI, his falsification of his statements of economic interest filed with the mayor, his use of multiple nominees, conduits for payments, and a numbered trust account to hide his ownership. The jury could have considered all these actions as weighing heavily against the defendant and thus found the exculpatory evidence to be pale in comparison. It is reasonable to conclude that Bush had the necessary criminal intent from the totality of his actions.

## II. THE INDICTMENT WAS NOT PREJUDICIALLY DUPLICITOUS.

██ Defendant Bush argues that each of the mail fraud counts in the indictment was duplicitous and is therefore fatally defective; that the critical prejudice to Bush here is that the jury members could have had divided views as to Bush's scheme and not been unanimous in determining that he was guilty of any single offense yet combined their views to convict on mail fraud. Thus, concludes Bush, "the resulting conviction . . . is very possibly an amalgam of views and based not on any one 'scheme' but on a compromise verdict of a number of separate schemes." In our view there is enough evidence in the record to support a verdict on all counts. Furthermore, we think that the jury was properly instructed so that they would not compromise their judgment and verdict. Furthermore, Bush's attack against the indictment on grounds of duplicity is misdirected. As we stated previously in *United States v. Tanner*, 471 F.2d 128, 139 (7th Cir. 1972), citing 8 J. Moore, Federal Practice II 8.03[1] at 8–6 and 7 (2nd ed. 1970):

"The prohibition against duplicity is designed to protect a defendant's right under the sixth amendment to notice of the 'nature and cause of the accusa-

tion' against him so that he may prepare a defense, and to guard against the possibility that 'confusion as to the basis of the verdict may subject the defendant to double jeopardy in the event of a subsequent prosecution.' "

In this case the indictment was quite specific. By clearly identifying the nature of Bush's scheme, its objects and the various means used to effectuate the scheme, the indictment gave Bush sufficient notice of the charge against him. Each of the eleven counts of the indictment charges only one offense—a mailing in furtherance of one multifaceted scheme in violation of the mail fraud statute. Bush's argument that the instant indictment charges distinct schemes is without support. *Weiss v. United States*, 122 F.2d 675, 680–1 (5th Cir.), *cert. denied* 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941); *Owens v. United States*, 221 F.2d 351, 354 (5th Cir. 1955); *United States v. MacAlpine*, 129 F.2d 737, 740 (7th Cir. 1942).

## III. THE ADMISSION OF HYPOTHETICAL TESTIMONY BY GOVERNMENT WITNESSES WAS NOT PREJUDICIAL ERROR.

At trial a number of the government's witnesses were allowed to answer the following hypothetical question: "Would you have voted to award the contract to Dell Airport Advertising if you had known Earl Bush was the 100 percent owner?" This question was met by strenuous objection from Bush's very able trial counsel. The three aldermen who testified stated that they would not have approved the contract. John Duba and William Downes both answered "No" when asked this question. When Mayor Daley was asked the same question, he responded:

"Well, I would do the reasonable thing to do. I would investigate the facts and circumstances and try to find out more about the information and I would have brought in Mr. Bush and the head of the Department of Aviation as well as the committee and

talked to them about it and talked to the corporation counsel about the man."

■ The propriety of admitting speculative and hypothetical testimony in a judicial proceeding is always questionable. Admission of such testimony in a criminal proceeding is always highly suspect. However, in this case, having reviewed the entire trial transcript it is evident that the trial judge fully understood the issues involved and conducted the trial in what appears to have been a model of fairness. Thus on this evidentiary question we rely heavily on his direction in admitting the hypothetical question. In ruling on the objection,[7] Judge Tone specifically stated that the issue of whether city officials would have recommended the contract in the absence of a misrepresentation by Bush was material in proving the crime charged. Each city official was allowed to testify about his state of mind in order that the government could prove-up the fraud charges. Had the witnesses testified that Bush's interest would not have affected their decision then we doubt whether the jury or the court could have found that a fraud was committed. In circumstances such as thus, a few limited authorities have sanctioned the admissibility of testimony elicited in response to a "what if" question.

The government places great reliance on *United States v. Isaacs, supra,* wherein the court stated:

"Several members of the Illinois Racing Board were asked on direct examination by the prosecutor whether they would have granted racing dates to CTE for 1967 and BJC for 1968 if they had known of Kerner's concealed interest in those companies. A typical answer was that of board member Crosby who said that he would not have voted to grant the dates. Later a similar question was asked board member McKellar on direct examination during the defense case, and his answer was that such knowledge would not have influenced his action. This subsequent use of similar evidence minimizes, if not cures, whatever there might have been in the admission of this bit of prosecution testimony. See 1 Wigmore on Evidence, Section 18, p. 345. In any event we believe that in a case such as that at bar the 'what if' questions were proper. *Bettman v. United States,* 224 F.2d 819, 830 (6th Cir.), *cert. denied* 239 U.S. 642, 36 S.Ct. 163, 60 L.Ed. 482; *United States v. Aleli,* 170 F.2d 18, 20 (3d Cir.); and *Searfoss v. Lehigh Valley R. Co.,* 76 F.2d 762, 763–764 (2d Cir.)."

■ We believe that the Court grudgingly approved of the testimony in *Isaacs, supra,* because it was useful to both sides. But, in addition, the Court recognized that this type of evidence could be proper in future cases involving fraud and thus gave the "what if" hypothetical questions judicial approval. We concur in that approval but add the caveat that normally such questions are improper unless they are used to show that a defendant's active misrepresentations or active concealment were materially relied upon by a victim of the fraud.[8]

The defendant further argues that there were no facts, no evidence, no documents adduced at trial which would have supported the opinion testimony.

---

**7.** Judge Tone originally ruled on this question in the first trial. Upon retrial he stood by his original decision.

**8.** Whether the witnesses were in fact deceived was essential to the proof of one object to the mail fraud scheme. Cf. *Phillips v. United States,* 356 F.2d 297, 308–09 (9th Cir. 1965) (evidence as to why victim relied upon particular representation relevant to mail fraud prose-

cution); *Linden v. United States,* 254 F.2d 560, 566 (4th Cir. 1958) (questions pertaining to why victims of scheme to defraud made or approved payments held relevant and admissible); *Haid v. United States,* 157 F.2d 630, 632 (9th Cir. 1946) (victim's testimony as to his state of mind in relying upon representations held relevant).

Quite to the contrary, we think that the prosecutor's hypothetical question was designed to be quite concise to probe the witness' state of mind. No additional facts or documents were needed or required to answer the question other than being informed that Bush did have an interest at the time the contract was being negotiated.

The defendant has cited a number of previous decisions [9] which have held that admission of such a hypothetical question was improper and prejudicial error. A reading of those opinions, however, discloses, to the extent it can be discerned from the opinions, that those cases involved situations in which the hypothetical testimony was elicited from an interested party or was deemed irrelevant by the trial judge. Here, on the other hand, the testimony was sought from witnesses who were not parties to the suit. Indeed, some of the opinions were given by former business associates of Bush who had no apparent desire to give testimony harmful to Bush and favorable to the government.

## IV. THE TRIAL COURT PROPERLY INSTRUCTED THE JURY.

Bush submits that the court gave four prejudicial instructions on scheme to defraud, duty to disclose, responsibility for decision making, and a summary instruc-

tion on defendant's duty to the city and to the mayor. We approve these instructions mainly for the reasons that are stated earlier in this opinion, all of which are based on the premise that Bush's conduct amounted to a crime cognizable under the mail fraud statute.

The first instruction [10] dealt with the scheme to defraud and advised the jury that deprivation of honest and loyal services of a public official or failure to disclose material information comes within the meaning of the statute. We think that there was authority for this instruction under *United States v. Barrett, supra; United States v. George, supra;* and *United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.), *cert. denied* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932). Since the deceitful concealment of material facts can be considered actual fraud the trial judge's instruction was appropriate. *Lustiger v. United States,* 386 F.2d 132, 138 (9th Cir. 1967), *cert. denied* 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968); *Cacy v. United States,* 298 F.2d 227, 229 (9th Cir. 1961).

The second instruction [11] to which Bush objects concerns his duty of disclosure. He contends that the central error in the instruction is that it states that he had a "duty imposed by law" to disclose his interest. In Bush's view, the

---

9. See: *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.,* 298 F.2d 356 at 360 (6th Cir. 1961) ("a witness may not testify as to what he would have done had the situation been different from what it actually was"); *Cohen v. Public Housing Administration,* 257 F.2d 73, 77 (5th Cir. 1958) ("testimony years after the critical event, as to what one's intentions were cannot take the place of acts done at that time"). *Boomer v. N.Y. Central R.R. Co.,* 409 F.2d 382, 385 (7th Cir. 1969); *Skogen v. Dow Chemical Co.,* 375 F.2d 692, 704 (8th Cir. 1967); *Whitson v. Aurora Iron & Metal Co.,* 297 F.2d 106, 111 (7th Cir. 1961). We recognize these cases for their precedential value but believe *United States v. Isaacs, supra,* to be controlling because it is so much more akin to the facts of this case.

10. The instruction read:

"A scheme to deprive the citizens of a municipality of the honest and loyal services

of a public official comes within the meaning of the term 'scheme or artifice to defraud' as that term is used in the mail fraud statute. Similarly, a scheme to deprive public officials of information material to a decision which they are required to make in their official capacity also comes within the meaning of a 'scheme or artifice to defraud' as used in the mail fraud statute."

11. The instruction read:

"The defendant, as Press Secretary and Director of Public Relations in the Office of the Mayor of the City of Chicago, had a duty imposed by law to disclose and not conceal facts known to him which he had reason to believe were material to the decisions of City officials in their conduct of the evaluation of contract proposals and the awarding and the administration of contracts."

instruction is incorrect because no such law exists. As previously discussed, however, *United States v. George, supra,* plainly states that an employee owes his employer a duty of loyalty which includes a duty not to conceal facts known to him which he has reason to believe are material to the employer's conduct of its business and affairs. Thus, Bush's duty to disclose need not be based upon the existence of some statute prescribing such a duty. Rather, his duty in this case was predicated upon the right of city officials to negotiate for and award the O'Hare display advertising contract with all relevant facts before them. Bush's introduction of Robert Dell to Commissioner Downes without an accompanying disclosure of his ownership of DAAI, his recommendation of DAAI to Deputy Mayor Duba without disclosure of his interest and his recommendation to Commissioner Downes concerning a profit-generating advertising display while, at the same time, denying that he had any interest in DAAI, constitute material misrepresentations and involve the concealment of material facts.

■ The third contested instruction informed the jury that "[t]he fact that the defendant did not himself have responsibility for the evaluation, awarding or administration of contracts does not change his duty of disclosure." Once again under decisions discussed extensively heretofore, *United States v. Proctor & Gamble Co., supra,* and *United States v. George, supra,* Bush, as an employee of the City of Chicago, owed a fiduciary duty of loyalty to his employer. Consequently, it is immaterial whether or not he had direct responsibility for the contracts. His duty of disclosure remained the same in either situation.

■ The fourth and last challenged instruction [12] did not, as Bush contends, virtually direct the jury to bring back a finding of guilty. Rather, the instruc-

tion simply stated that the jury may find the existence of a scheme within the meaning of the mail fraud statute if it should find, from all the evidence, that Bush devised a scheme in which he would breach his duty of disclosure.

This instruction, however, must be considered in the context in which it was given. Viewing it together with the court's charge on intent, this instruction did not direct the jury to return a guilty verdict. Thus, immediately after giving the instruction here at issue, the court charged the jury that:

"The defendant claims that he did not have the specific intent previously defined in these instructions and he has offered evidence of his good faith in forming Dell Airport Advertising, Inc., and in seeking and in performing the airport advertising contract and the renewal of that contract. This contention of good faith is based on his testimony that he did not know that he had the duty of disclosure previously defined in these instructions, that is, the duty to disclose his ownership of Dell Airport Advertising, Inc., to the Mayor and other officers of the City who had responsibility in connection with the awarding of the airport advertising contract.

Defendant has thus offered evidence that he did not know that any failure to disclose would violate a duty imposed by law. Unless outweighed by evidence to the contrary, the law presumes that every person knows what the law forbids and what the law requires to be done. Specific intent is an element of the crime charged in the indictment. Therefore, evidence that defendant failed to disclose because he did not know he had a duty to disclose is to be considered by the jury in determining whether or not the defendant acted or failed to act with the

12. The instruction read:

"If you should find, beyond a reasonable doubt, after considering all the evidence, that the defendant devised a scheme in which he would breach his duty of disclosure, then you may find the existence of a scheme which was an element of the offense of mail fraud."

required specific intent. You cannot find the defendant guilty unless you find beyond a reasonable doubt that he had the specific intent previously defined and that he did not act in good faith."

Additionally, the court instructed the jury with respect to Bush's duty to disclose that:

"Except for this Illinois statute [requiring municipal employees earning $20,000 per year or more to file verified statements of economic interests], at all times described in the indictment there has not been any other Illinois statute or municipal ordinance of the City of Chicago requiring a person holding a municipal position, including the defendant's position, to disclose and report his interest in and income from any company or entity doing business with the city by which he was employed. Evidence has been introduced that defendant filed a correct, verified written statement of economic interest with the County Clerk before July 1, 1972 and before April 30, 1973. You may consider this evidence in deciding whether or not the defendant acted in good faith."

Since the charge to the jury with respect to Bush's duty of disclosure accurately reflects the state of the law, and because the charge required a finding of specific intent to defraud as a prerequisite to a finding of guilt and informed the jury that good faith was a complete defense, no error can be attributed to the instructions here at issue.

Accordingly the judgment of conviction is affirmed in all respects.

Affirmed.