**TCP INDUSTRIES, INC.,
Plaintiff-Appellee,**

**v.**

**UNIROYAL, INC., Defendant-Appellant,**

**Donald C. Fresne, Defendant-Appellee.**

No. 80–1010.

United States Court of Appeals,
Sixth Circuit.

Argued June 2, 1981.

Decided Sept. 29, 1981.

Rehearing Denied Nov. 17, 1981.

Robert M. Klein, Leslie W. Fleming, Detroit, Mich., Sidney P. Howell, New York City, for defendant-appellant.

W. Merritt Jones, Jr., Nancy L. Hutcheson, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for plaintiff-appellee.

Before ENGEL, KEITH and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

TCP Industries, Inc. (TCP) filed this breach of contract action against Uniroyal, Inc. (Uniroyal) to recover profits lost when Uniroyal refused to purchase butadiene pursuant to an April 1, 1974 contract. Uniroyal counterclaimed seeking damages from TCP and Donald C. Fresne (Fresne), its president and principal shareholder, for fraud, breach of an earlier 1970 contract, and breach of the 1974 contract. The jury returned a verdict for TCP in the amount of $1,045,650 and judgments of no cause of action on Uniroyal's three counterclaims. Uniroyal appeals. The parties agree that the Uniform Commercial Code applies. They did not object to the District Court's application of Michigan law, the law of the forum.

Butadiene is a petrochemical product extracted from gas and oil and principally used in the production of synthetic rubber. TCP does not produce butadiene but has since 1966 acted as a middleman in arranging sales of the product from El Paso Products Company (El Paso), a Texas refinery, to Uniroyal. TCP sold to Uniroyal at the same price it purchased butadiene from El Paso. Historically, its sole profit was limited to a commission or a reseller's discount of two-tenths ($\frac{2}{10}$) of a cent per pound which El Paso paid TCP out of El Paso's price.

On November 3, 1970, TCP and Uniroyal entered into the 1970 contract. That contract covered the period of April 1, 1971 through March 31, 1974 and provided for the annual sale of 50 million pounds of butadiene at 8.00 to 8.25 cents per pound, depending on place of delivery. The contract restricted any price increase to the third year of the contract and then only to passing on those escalations in El Paso's production costs specifically related to increased labor or natural or butane gas costs which El Paso passed on to TCP. The contract also included a meet or release clause which provided that if Uniroyal received a bona fide offer from another producer to sell it at least 10,000,000 pounds of butadiene at a lower price, then TCP would have to meet that price within 30 days or release Uniroyal from its obligation to purchase such amount under the contract.

El Paso continued to sell butadiene to TCP which resold it to Uniroyal under these conditions until September 1973, six months before the expiration of TCP's contract

with Uniroyal, when, unknown to Uniroyal, TCP's three year contract with El Paso expired. El Paso thereupon advised TCP that it would continue to sell it butadiene but that its reseller's discount would be discontinued and TCP should look for its profits solely from its markup to Uniroyal.

In October 1973, TCP increased its price to Uniroyal by .00247 per pound. In February 1973, El Paso increased its price to TCP by 3.5 cents to 11.75 cents per pound. TCP passed this price increase on to Uniroyal along with an additional increase of almost three cents. On March 1, 1974, TCP initiated another one cent per pound increase.[1] Uniroyal continued to accept and pay for butadiene at the increased prices. The parties agree and it is undisputed that except for El Paso's 3.5 cent increase passed along by TCP in February, the remaining increases were contrary to the express provisions of the written contract, and resulted in an overcharge to Uniroyal of $301,679.

During the same period that TCP was raising the price of butadiene under the 1970 contract, the parties were negotiating the terms of the 1974 contract. These negotiations were conducted in an atmosphere described by those in the industry as nothing less than chaotic. Price controls for butadiene expired in early 1974. Because of the shortage of crude oil due to the Arab oil embargo, a greater proportion of the supply of oil was being used to produce fuel oil rather than petrochemicals such as butadiene. Butadiene sellers were refusing to take on new customers. Since Uniroyal could not make synthetic rubber without butadiene, TCP's 50 million pound annual supply was extremely valuable and Uniroyal adopted measures to ensure itself of this dependable supply of butadiene. After several months of bargaining, Uniroyal and TCP entered into a new contract which represented a dramatic departure in form and substance from their previous agreements. This contract did not have a price escalation clause but instead contained the following pricing provision:

> The price for butadiene purchased hereunder shall be $0.1347 per pound F.O.B. point of origin. The price for butadiene is subject to change providing Texas Chemical gives no less than fifteen days notice.

The 1974 contract did not contain a meet or release clause for the first two years of its four year term.

Soon after signing, TCP informed Uniroyal that the price would increase from 13.7 cents on April 1, 1974, to 20.75 cents on July 1, and to 22.55 cents on October 1. By November 1974, the shortage of butadiene had eased and producers were ready to take on new customers. That month Uniroyal took only 489,000 pounds of butadiene as opposed to an average of 3,642,000 pounds in each of the previous seven months. Uniroyal took no butadiene from December 1974 through February 1975, first saying that it needed no butadiene and then explaining that the price was too high. Uniroyal again started to purchase in March 1975 at about 19.0 cents per pound. The parties agreed to reserve their rights against each other under the contract.

### THE 1970 CONTRACT

■ On appeal, Uniroyal argues that the adverse verdicts with respect to its claims for breach of the 1970 contract were serious miscarriages of justice. It asserts that there was not sufficient evidence to submit to the jury the question of modification or waiver of the 1970 contract. No motion for directed verdict having been made,[2] the question of the sufficiency of the evidence to support the jury's verdict is not available

---

1. These figures have been taken from the pretrial order. Although there are discrepancies between these figures and those found in the briefs, exhibits and transcripts of the proceedings, the parties do not dispute that the total amount in controversy is $301,679.

2. According to the record Uniroyal filed a document entitled Uniroyal's Motion for Judgment N.O.V. and for New Trial as to TCP's claim of breach of the 1970 contract. A motion for judgment n. o. v. cannot be entertained unless the moving party has made a timely motion for a directed verdict at the close of all the evidence. F.R.Civ.P. 50(b). Uniroyal admitted at the October 12 hearing that no such motion was made on this issue.

as grounds for a motion for new trial. *Southern Railway Co. v. Miller*, 285 F.2d 202, 206 (6th Cir. 1960). Uniroyal further argues that since there was an absolute absence of evidence to support these verdicts, the verdicts were against the clear weight of the evidence, and the trial court's refusal to grant a new trial on each of these claims was error. We are not precluded from considering whether the trial court erred in denying Uniroyal's motion for a new trial, since motions for directed verdicts and judgments n.o.v. are not prerequisites to a motion for a new trial. *United States v. Bucon Construction Company*, 430 F.2d 420 (5th Cir. 1970).

In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, a district judge must compare the opposing proofs and weigh the evidence (*Felton v. Spiro*, 78 F. 576 (6th Cir. 1897) (Taft, J.), *General American Life Ins. Co. v. Central Nat'l Bank*, 136 F.2d 821 (6th Cir. 1943), and "it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence * * *."

> \* \* \* \* \* \*

"[C]ourts are not free to reweigh the evidence and set aside the jury verdicts merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tenant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); *Werthan Bag Corp. v. Agnew*, 202 F.2d 119, 122 (6th Cir. 1953). Thus, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached.

> \* \* \* \* \* \*

With respect to the applicable scope of review of a District Court decision granting or denying a new trial on the basis of the weight of the evidence, it is well settled that reversal may be predicated only upon an abuse of discretion.

*Duncan v. Duncan*, 377 F.2d 49, 52–53 (6th Cir.), *cert. denied*, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260 (1967) (citations omitted).

The jury heard Donald Fresne testify that some time in September 1973 El Paso advised that it was no longer going to give any reseller's consideration or commission and that effective October 1, 1973 El Paso was going to modify its type of delivery and sell material on an F.O.B. basis as opposed to a delivered basis. El Paso also advised that the government-regulated price of butadiene would be 8.25 cents per pound F.O.B. producing plant. TCP thereupon sent Uniroyal a letter stating that effective October 1, 1973 the price to it would be 0.8497 cents per pound per producing plant. The letter also contained a stock paragraph concerning prices which could be charged per the Cost of Living Council's regulations. When the price freeze was lifted in February 1974, Fresne told Wills of Uniroyal that it would be impossible for TCP to adhere to provisions set forth in the contract, "specifically escalation factors." He further testified that he "told them (Wills) that we were going to increase our prices and *there would be no relationship to the increase in the escalation factors.*" (emphasis added). Fresne admitted that Uniroyal did not know that TCP was making increased profits since Fresne had never told Uniroyal the price it was paying El Paso.

Paul Mester, Uniroyal's Director of Purchasing, testified that he did not question the price of butadiene quoted in TCP's October 1, 1973 letter believing it reflected El Paso's price increase to TCP. When Wills, a purchaser for Uniroyal, brought the February increase to his attention, he accepted it as being in accord with the contract. He balked over the March price hike, however, since nothing was happening in the marketplace warranting that kind of an increase. Wills told him that the increase was TCP's pass through of El Paso's increase and there was nothing Uniroyal could do about it. Mester further testified that it was never reported to him that Fresne told anyone at Uniroyal that TCP could no longer abide by the contract, or that TCP asked to be excused from the contract.

Wills testified that it was his understanding that TCP was to receive ¼ of a cent per pound for materials it sold to Uniroyal. Although he did not know whether TCP, because of its size, was subject to the Cost of Living Council's pricing regulations, it was his understanding that the price quoted in the October 1973 letter was the price TCP was paying El Paso. At no time did Fresne tell him anything that would indicate that the price increases were not a result of the contract's escalation clause. Wills first discovered that Fresne was no longer receiving a ¼ of a cent commission as a result of a telephone call to El Paso in February 1975 on another matter.

■ In denying Uniroyal's motion for a new trial, the court stated that the jury "believed the testimony of the plaintiff's principal officer, Fresne, and they liked what he said and they had respect for his judgment." From our review of the record we observe that a jury could have chosen to believe Fresne's testimony over that of Wills and Mester and reasonably concluded that the parties modified the 1970 contract and that the elements of fraud were not made out. It is not unreasonable to conclude that Uniroyal agreed to this modification to secure another long term contract in the then tight market. We agree with the District Judge's conclusion that the question depended upon which witness the jury believed. We cannot say that such conclusion was insupportable, resulted in a miscarriage of justice, or that the District Judge abused his discretion in so ruling.

■ Uniroyal's vague and general complaint regarding the jury instructions as to waiver and modification is not well taken. The instruction as to waiver conformed to Michigan law. *Fitzgerald v. Hubert Herman, Inc.*, 23 Mich.App. 716, 179 N.W.2d 252 (1970); *Grix v. Liquor Control Comm'n*, 304

Mich. 269, 8 N.W.2d 62 (1943). While additional instructions on modification might have been helpful, Uniroyal does not indicate how it was prejudiced by the correct instructions given.[3]

■ Finally, Uniroyal contends that TCP should have been precluded from submitting its modification defense to the jury because the alleged modification was not in writing and thus did not comply with M.C.L.A. § 440.2201, the U.C.C.'s statute of frauds provision. We cannot agree. The statute of frauds is an affirmative defense which generally is waived if not raised as a defense in the pleadings. Fed.R.Civ.P. 8(c). *Island Block Corp. v. Jefferson Construction Overseas, Inc.*, 349 F.2d 322 (3d Cir. 1965). Uniroyal points out that waiver was raised in TCP's answer to Uniroyal's counterclaim and that the Rules of Civil Procedure do not contemplate any pleading in response. Uniroyal failed, however, to raise this issue in the pretrial statement, failed to raise it at trial and first raised it in its appellate brief. Failure to raise this claim in the trial court constitutes a waiver. Furthermore, the Code provides that a contract which does not satisfy the writing requirement of M.C.L.A. § 440.2201(1) but which is valid in other respects is enforceable with respect to goods for which payment has been made and accepted or which have been received and accepted. M.C.L.A. § 440.-2201(3)(c). Since Uniroyal accepted and paid for the butadiene shipped under the 1970 contract, the Code's statute of frauds is not at issue here.

## THE 1974 CONTRACT

Uniroyal also argues that the evidence was insufficient to support the jury's finding that TCP was entitled to the price it set under the 1974 contract. The contract contained the following pricing provision:

---

**3.** Uniroyal makes similar allegations about a number of other jury instructions. For example, it argues that the court's instruction on fair dealing should have been more specific. We do not agree. To have given a more specific instruction on fair dealing where there was no evidence of the standard of fair dealing would have required the court to adopt the position of either TCP or Uniroyal as to what fair dealing comprised. This, of course, would have been improper. We have reviewed all of the instructions given and conclude that while they are not as clear as they might have been and additional instructions might have been helpful, the jury was adequately instructed.

The price for butadiene purchased hereunder shall be $0.1347 per pound F.O.B. point origin. The price for butadiene is subject to change providing Texas Chemical gives no less than fifteen days notice. The District Court held this language ambiguous and permitted parol evidence. Uniroyal claims that TCP was limited by the parties' prior course of dealing to passing on to Uniroyal changes in the prices charged to TCP by El Paso. Uniroyal contends that if TCP was not limited to passing through El Paso's price, then it failed to set a reasonable price in accordance with M.C.L.A. § 440.2305.

■ In the usual case, the question of the parties' intentions when a price term is left open is a question for the trier of fact. Official Comment 2, M.C.L.A. § 440.2305. The jury was presented with considerable evidence that the parties vigorously negotiated the 1974 contract. Fresne testified that he told Wills that he wanted the right to unilaterally set the price at the high end of the market. He explained that this was a major reason for the six month negotiation period. TCP negotiated the deletion of the standard meet or release clause during the first two years of the four year contract and refused to include Uniroyal's suggested right to cancel clause if the price charged for butadiene was unacceptable. Also persuasive that the prior course of dealing as to pricing did not govern the 1974 contract was that the pricing language of the 1970 contract was not carried over to, and in fact was changed dramatically in the 1974 contract. The parties intentionally deleted the explicit and elaborate formula for pricing (the escalation clause) found in the 1970 contract and in its place required that TCP give Uniroyal 15 days notice prior to implementing a price increase. If the parties had intended to continue the explicit pricing terms of the 1970 contract, or had intended that only El Paso's increases to TCP would be passed along to Uniroyal, such language could have again been utilized. In fact, that specific language was deleted. The jury was presented with sufficient evidence that the "subject to change" provision of the 1974 contract did not limit TCP's price increases to passing through El Paso's increased costs.

Nor do we accept Uniroyal's alternative argument. M.C.L.A. § 440.2305 governs the open price term of the 1974 contract. The pertinent provisions provide:

(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

Official Comment 3, referring to subsection (2), states:

[D]ealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2–103).

M.C.L.A. § 440.2103(1)(b) defines "good faith" in the case of a merchant as "honestly in fact and the observance of reasonable commercial standards of fair dealing in the trade."

■ Neither the Code nor the Official Comments to the Code require that a merchant-seller price at fair market value under a contract with an open price term, but specify that prices must be "reasonable" and set pursuant to "reasonable commercial standards of fair dealing in the trade."

When there is a gap as to price, 2–305 directs the court to determine 'a reasonable price,' provided the parties intended a

contract. Note that the section says 'a reasonable price' and not 'fair market value of the goods.' In many instances these two would not be identical. For example, evidence of a prior course of dealing between the parties might show a price below or above market. Without more, a court could justifiably hold in these circumstances that the course of dealing price is the 'reasonable price.'

J. White & R. Summers, *Uniform Commercial Code*, § 3–7, 17 (2d ed. 1980).

Similarly, the price might be reasonable although not set pursuant to "reasonable commercial standards of fair dealing." An example would be where the party sets the open price at a reasonable retail price although reasonable commercial standards of fair dealing would require that the price be set at a reasonable wholesale rate. In the instant case the price was set within the wholesale range. The only issue is whether a spot market price within that range was reasonable vis-á-vis the existence of a long term contract price and whether that is a question of fact or of law.

At all times under the 1974 contract TCP sold or offered to sell butadiene to Uniroyal at prices within the range of those reported in the *Chemical Marketing Reporter*, a domestic publication specifically providing information on the butadiene market. The parties stipulated that the following price ranges appeared in the *Chemical Marketing Reporter* for the period April 1, 1974 to March 31, 1976.

| | |
|---|---|
| April, 1974 — June, 1974 | 12–17 cents |
| July, 1974 — September, 1974 | 16–25 cents |
| October, 1974 — January, 1975 | 17½–25 cents |
| February, 1975 — March, 1976 | 18–22 cents |

TCP's prices of 20.75 cents on July 1, 1974, and 22.25 cents on October 1, 1974, while tending toward the high end, were always well within the above range. Although Jesse Owens of El Paso initially testified that 22.25 cents per pound was not a "fair" price for the period of November 1974 through March 1975, he later explained that this conclusion was based on El Paso's long term contracts all of which contained a meet or release clause, the effect of which is to keep prices competitive to within ½ cent per pound. TCP, however, had negotiated with Uniroyal to omit such a clause during the first two years of the contract and include it for the final two years. On the other hand, Ralph Ericsson, president of a company which produces an annual survey of the world-wide butadiene industry, testified that during the last six months of 1974 butadiene prices were rising as high as 28.5 on a straight pass through basis. In his opinion, TCP's price was commercially reasonable under all the circumstances. Thus, there was evidence from which the jury could have reasonably found that TCP's price for butadiene under the 1974 contract was commercially reasonable and set in good faith. Uniroyal too narrowly defines good faith and commercial reasonableness when it contends that as a matter of law TCP met neither because it set its price in accord with total market prices including the spot market rate than pricing solely on long term contract prices.

While taking testimony on the market price of butadiene the District Court allowed Ralph Ericsson, qualified as an expert in the production and pricing of butadiene, to testify as to the meaning of the pricing clause contained in the 1974 contract. Over objection, Ericsson testified that he had never seen a price clause exactly like that one and that "the way I read this contract, the seller had the right to set the price and the buyer was obligated to accept that price." Following admission of this evidence, the District Court instructed the jury that the testimony was admitted for such value as the jury might wish to give it. Subsequently, Uniroyal's timely motion for new trial on this basis was denied.

Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible. *International Paper Company v. Standard Industries, Inc.*, 389 F.2d 99, 102 n.2 (10th Cir. 1968); *Whitson v. Aurora Iron & Metal Co.*, 297 F.2d 106, 111 (7th Cir. 1961); *Shields v. Weller*, 270 Mich. 7, 257 N.W. 765 (1934). Here the witness was not testifying about a technical term

which needed explaining. Since the witness had never seen a contract without a meet and release clause or cancellation clause where there was an open pricing provision the witness could not testify to the meaning given under such a contract by the trade. The question of what the contract clause meant ·was a factual one for the jury to determine from the testimony presented. *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969).

▇ While we find that the District Court erred in admitting this testimony we note that no error in the admission or exclusion of evidence is ground for reversal or granting a new trial unless refusal to take such action appears to the court to be inconsistent with substantial justice. *Prater v. Sears, Roebuck & Co.*, 372 F.2d 447, 448 (6th Cir. 1967); *Hoag v. City of Detroit*, 185 F.2d 764 (6th Cir. 1950); *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978); *Kilgore v. Greyhound Corp., Southern Greyhound Lines*, 30 F.R.D. 385 (E.D.Tenn.1962). Considering the entire record we do not find that the District Court's denial of Uniroyal's motion for new trial on the grounds of Ericsson's improper testimony was inconsistent with substantial justice.

Uniroyal next contends that it was entitled to an instruction on the question of mitigation of damages or to a directed verdict since the evidence showed that had TCP mitigated its damages by reselling in the spot market it would have suffered no loss. Although timely requested, the District Court failed to give Uniroyal's mitigation instruction. TCP counters that the Uniform Commercial Code does not specifically provide that a merchant has a duty to mitigate or a duty to resell. To this Uniroyal responds that the general and well settled principle of law requiring mitigation is incorporated into the Code by way of M.C.L.A. § 440.1103. Furthermore, Uniroyal argues that in failing to mitigate, TCP also breached the Code's pervasive requirement that all transactions be subject to good faith. While we agree that the U.C.C.

contains no specific provision requiring mitigation under the factual circumstances existing here, we find Uniroyal's application of Section 440.1103 appropriate in this case.

Generally speaking, all facts or circumstances which go to a reduction in the amount necessary to compensate plaintiff on account of the wrong for which the suit is brought may be shown in mitigation of damages; and it has been generally recognized that on the breach of a sale contract by a buyer, the seller should minimize or keep down his damages so far as it was reasonably within his power to do so. The buyer could not be charged with damages· which, with reasonable effort, the seller could have prevented; and the seller should exercise ordinary care and diligence to prevent further loss to the buyer, after notice from him that he will not perform the contract.

\*    \*    \*    \*    \*    \*

The Uniform Commercial Code should not affect any of the above principles, since supplementary general principles of law and equity are retained.

67 Am.Jur.2d *Sales* § 653 (1973).

▇ The law is clear in Michigan that it is the duty of the party injured through the breach of contract to mitigate damages and thus minimize his loss. *Januska v. Mullins*, 329 Mich. 606, 613, 46 N.W.2d 398 (1951). Michigan has also recognized the duty to mitigate damages in breach of contract cases subject to the Uniform Commercial Code. *Ambassador Steel v. Ewald Steel*, 33 Mich.App. 495, 190 N.W.2d 275 (1971). The failure to mitigate damages is an affirmative defense, *Fothergill v. McKay Press*, 374 Mich. 138, 141, 132 N.W.2d 144 (1965), with the burden upon the defendant to show in mitigation of the damages claimed that the plaintiff has not used every reasonable effort within his power so to minimize his damages. *McCullagh v. Goodyear Tire & Rubber Co.*, 342 Mich. 244, 69 N.W.2d 731 (1955); *Edgecomb v. Traverse City School District*, 341 Mich. 106, 115, 67 N.W.2d 87 (1954); *Maraldo Asphalt v. Osgood Co.*, 53 Mich.App. 324, 220 N.W.2d 50 (1974).

■ Although it is the duty of the court upon request to charge the jury on mitigation, *McCullagh v. Goodyear Tire, supra,* Uniroyal may not complain of the failure to give an instruction on mitigation since it did not object to such failure before the jury retired to consider its verdict. Fed.R. Civ.P. 51. An opportunity was given to make objections and Uniroyal did make other objections which resulted in additional instructions. The instruction on mitigation was not such "an essential part of this case" that the District Court "should have covered it in its instruction without a request therefor." Nor does it go "to the heart of the case" so that we must take note of the error, even though no objection was made at the conclusion of the charge of the court. *O'Brien v. Willys Motors, Inc.,* 385 F.2d 163, 167 (6th Cir. 1967). *See also Batesole v. Stratford,* 505 F.2d 804 (6th Cir. 1974). The issues in this case were admittedly numerous and complex. We nonetheless note that counsel for Uniroyal did not argue mitigation in final argument, which is some indication that it was not central to Uniroyal's case. This is not a case where the District Court had stated it would not give the requested instruction, or where there had been full discussion of the issue, so that further objection would only be a formality. *See Hasselbrink v. Speelman,* 246 F.2d 34 (6th Cir. 1957). Rather it appears that compliance with Rule 51 would have given the District Court an opportunity to correct any error.

■ Moreover, there is a serious question whether Uniroyal met its burden to show that TCP did not use every reasonable effort within its power to minimize its damages. At the very least there was an issue of fact for the jury and Uniroyal is not entitled to mitigation as a matter of law. Fresne testified that following Uniroyal's refusal to purchase in November 1974 he could not remember whether he tried to sell the cancelled butadiene to any other potential purchaser. There was evidence, however, that TCP notified El Paso to cancel the production of the butadiene intended for Uniroyal. Uniroyal offered no direct proof that had TCP not cancelled the production of butadiene it could have sold the commodity to other purchasers at the same price it was selling to Uniroyal. In fact, it was agreed that during the period in question, the supply of butadiene was becoming more readily available and at cheaper prices. One of the reasons given for Uniroyal's failure to buy was the fact that the market situation had significantly changed. Moreover, the agreement between El Paso and TCP provided that with very few minor exceptions, TCP could sell the butadiene it purchased from El Paso only to Uniroyal. Thus, to sustain its burden, Uniroyal would not only have been required to show that there were third persons who would have been willing to purchase butadiene at the Uniroyal-TCP price or some other price above TCP's cost, but that once Uniroyal breached, TCP could actually have purchased butadiene for El Paso and sold to a third party notwithstanding the TCP-El Paso contract.

> Since plaintiff is only under the duty to make "reasonable" efforts to mitigate damages, plaintiff need not take the unreasonable action of breaching the contract with the third person.

*Robbins, Inc. v. Ewald Steel Co.,* 52 Mich. App. 599, 603, 218 N.W.2d 125 (1974).

Under the circumstances of this case, one reasonable action was for TCP to request El Paso to stop production of the butadiene scheduled for delivery to Uniroyal.

■ Finally, Uniroyal argues that the District Court erred when it instructed the jury that if it found that Uniroyal had breached the 1974 contract, TCP was entitled to recover as damages profits lost as a result of that breach. It now argues that no instruction on lost profits should have been given since the correct measure of damages was the difference between the market price and the contract price at the time of the breach. Once again Uniroyal failed to object to the instruction that was given. Moreover, it requested a substan-

tially similar instruction.[4] The power to consider error to which no objections were made should be used sparingly and only in the interests of justice. We therefore consider the nature of this alleged error.

M.C.L.A. § 440.2708(2) provides for recovery of lost profits where the difference between market and contract price is inadequate. Examples include (1) where the nonbreaching seller is a "middleman" which TCP appears to be, and (2) the lost volume seller, where although the seller is able to sell the product to a third party, but for the breach the seller would have two sales. See Practice Commentary, M.C.L.A. § 440.2708. The concept of allowing the "middleman" to recover lost profits is explained in *Distribu-Dor, Inc. v. Karadanis*, 11 Cal.App.3d 463, 90 Cal.Rptr. 231, 235 (1970).

> The legislative history of section 2708 indicates that it is similar to former Civil Code, section 1784(3). . . . [t]he court described a "middleman" to be a "special circumstance" under which the measure of damages as the difference between the market price and contract price is not a true representation of the seller's damages. . . . "[A]n award of damages based upon the difference between the contract price and the market price does not adequately compensate a middleman upon his buyer's repudiation of an agreement to purchase goods from him, but that the proper measure of damages in such a case is the dealer's anticipated profit. The rationale supportive of this principle is that "The rule that the seller's damages are measured by the contract price minus the market value of the goods retained is correct only in case the subject of the sale is specific goods of such a character that their rejection makes possible to the seller a second sale to a third person, one that he could not have made except for the rejection.' (citations omitted) Accordingly, in cases involving a sale to a buyer by an intermediate dealer whose

relationship with a producer enables him to supply all obtainable customers, the buyer's breach does not make possible a new sale in which the profit lost by the breach would be replaced but, rather, results in an irreplaceable loss of profits because every new sale by such seller would bring in a new profit."

Here, TCP's contract with El Paso permitted it to sell El Paso's butadiene only to Uniroyal. If a sale to another buyer would have been possible, notwithstanding that contract, arguably that sale would not have been an irreplaceable loss of profits but rather a substitute of one buyer for another. Whether lost profits were the appropriate measure of damages is such a close question here we do not believe that Uniroyal has shown that the District Court's instruction was fundamental error.

The judgment of the District Court is affirmed.

---

**4.** Having requested a similar instruction on lost profits, Uniroyal did not object at the time it was given. It was only at the post-trial hearing on a motion for new trial that Uniroyal asserted that the proper measure of damages was the difference between the market price and contract price, and not lost profits.