**BALMORAL CINEMA, INC., Plaintiff,**

v.

**BUENA VISTA DISTRIBUTION CO., INC., Paramount Pictures Corporation, Universal Film Exchanges, Inc., et al., Defendants.**

No. 77–2101–M.

United States District Court, W.D. Tennessee, W.D.

Aug. 26, 1987.

Barry Kuhn, Carl Olson, Memphis, Tenn., Lawrence Papale, San Francisco, Cal., for plaintiff.

Walter Armstrong, Jr., Jon McCalla, Memphis, Tenn., Phillip A. Wittman, New Orleans, La., for defendants.

## ORDER ON MOTION FOR
## NEW TRIAL

McRAE, Senior District Judge.

Presently before the Court is the Motion of Plaintiff Balmoral Cinema, Inc. for a New Trial. It seeks a new trial against the defendants Buena Vista, Paramount, and Universal on the grounds that there is no substantial evidence to support the jury's verdict in favor of these three defendants and further that the verdicts were contrary to the clear weight of the evidence as to these three defendants.

The plaintiff is a corporation that was caused to be formed by one Frank C. Warner who conceived the idea and put in operation a movie theatre in a suburban area of Memphis known as the Balmoral area where there was located a shopping center. Mr. Warner from its inception served as the president of the theatre company and has pursued the long and arduous journey which the present lawsuit has traveled. Balmoral Cinema, Inc. was an exhibitor of movie films. It desired to have first-run films and therefore competed with the established exhibitors in the Memphis, Tennessee area. The complaint was filed on February 15, 1977. Originally it had nineteen defendants. These were primarily divided into two categories of corporations or individuals involved in the presentation of commercial movie films to the public in the Memphis area. One group constituted the other exhibitors in the Memphis area. The members of the other group were known as the "distributors." They were either divisions of or affiliates of the major producers of films. Their job was to distribute the film commercially and competitively throughout the United States, usually through regional offices. The attorneys for the plaintiff who filed the complaint did not remain in the case. The case has been transferred by the judges of the Western District of Tennessee three different times for various reasons. The undersigned was assigned the case originally in 1977. Thereafter it was transferred to the Honorable Harry Wellford as a district judge. His docket was assumed by the Honorable Julia Smith Gibbons after Judge Wellford was appointed to the Court of Appeals for the Sixth Circuit. Due to a conflict, Judge Gibbons transferred the case back to the undersigned.

It should also be noted that for an extended period the case was transferred by the multidistrict litigation panel to another district for discovery along with other movie industry cases. After considerable time-consuming and expensive activity, the case was transferred back here with little or no help being obtained from the multidistrict experience. Different counsel for the plaintiff were obtained. Settlements of undisclosed amounts were made with exhibitor defendants, and the Court is advised that the funds generated by the exhibitor settlements were used to finance the trial of this case against nine distributors. The case was tried in the latter part of November and early December 1986. Special interrogatories were submitted to the jury,

and on December 10, after more than three weeks of trial, the jury returned unanimous verdicts in favor of all nine distributor defendants.

The Motion for New Trial is limited to three of the defendants, and it raises as grounds the lack of substantial evidence to support the jury's verdict and the verdict being contrary to the weight of the evidence. Memoranda have been filed, and this constitutes the Court's ruling on the Motion for New Trial. The United States Court of Appeals for the Sixth Circuit has interpreted Rule 59 of the Federal Rules of Civil Procedure to establish the appropriate standard to apply to a motion for new trial based on the two grounds asserted by the plaintiff. That standard is as follows:

> [C]ourts are not free to reweigh the evidence and set aside the jury verdicts merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. *Tenant [Tennant] v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); *Werthan Bag Corp. v. Agnew*, 202 F.2d 119, 122 (6th Cir.1953). Thus, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached.
> *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir.1981), citing *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.1967).

In this case, the plaintiff is asking the Court to displace the jury's evaluation of the evidence and of the credibility of the witnesses, even though the determination of witness credibility is a matter peculiarly within the province of the jury.

The defendants offered considerable evidence on which the jury could base its conclusion that the distributors did not participate in the exhibitor split in Memphis nor enter into any agreement to deprive the Balmoral Theatre of access to first-run films. To the contrary, evidence was offered that Balmoral was licensed first-run films when its offer was superior. Paramount awarded the plaintiff not only the first film which it sought but four of the first seven on which it bid. One of these was "Hustle," a top twenty film in that year. The plaintiff failed to bid on any Buena Vista films for the first seven months of its operation, but when it did begin to bid, it was awarded films. The same is true of Universal which awarded the plaintiff "Rooster Cogburn," the very first film it bid on from Universal.

In addition, substantial evidence in the record supports the conclusion that the loss suffered by the Balmoral Theatre was the result of forces other than the activities of the defendants. That evidence also provides a reasonable basis for the jury's verdict.

Mr. Warner displayed an extremely constant and continual amount of energy and determination in the attempt to establish the Balmoral Theatre as a profitable venture and in the pursuit of this lawsuit. Unfortunately there is very substantial evidence to establish that his confidence was misplaced and that his inexperience was accompanied by very poor judgment in the operation of the theatre.

The jury heard from Mr. William Kirksey, a man with over thirty years experience in the motion picture business in and around Memphis, who testified that he abandoned his plan to invest in the Balmoral Theatre after a thorough investigation into its projected operations and finances, including analyses prepared by a certified public accountant, demonstrated that the theatre could not make money due to the lease terms, overhead and location. Therefore the jury had substantial evidence that the plaintiff's operation was poorly located, poorly managed, handicapped by insufficient expertise in licensing high grossing films, plagued by labor disputes and burdened by the highest overhead of any screen in Memphis. Based on this evidence, the jury could reasonably conclude that these factors caused the plaintiff's business failure.

The plaintiff relies heavily upon the testimony of Larry Fine, a witness who was called early in the trial by the plaintiff. Fine was a Branch Manager for Buena

Vista in New Orleans from the summer of 1975 through approximately June of 1976. The New Orleans Branch included Memphis as part of its territory. He testified that he learned early in his employment in New Orleans that there was a split among some of the exhibitors in Memphis. He testified that the exhibitors in the split determined which exhibitors would get certain first-run films by prearrangement; however, he also noted that there were numerous exceptions to the control by members of the split. This testimony was offered to establish participation in the split by Buena Vista as a distributor. However, his testimony taken as a whole does not support plaintiff's position.

On cross-examination, strong contradictory testimony was brought out. For example, his testimony reflects on page 49 of the transcript the following:

Q. Now so far as your know, Mr. Fine, isn't it true that, while you were with Buena Vista as its branch manager in New Orleans, that Buena Vista licensed its films to the exhibitor that offered it the best terms?

A. That's—yes.

Q. And that was always everywhere true during the period from October of 1975 when the Balmoral began operations, up until the time that you left Buena Vista in July of 1976?

A. That was always true, that's how— yeah, they—that's how they licensed their pictures.

Additionally, when confronted with some inconsistent testimony, he said on page 44 of the transcript: "I'm not so sure there is such a thing as the truth."

There was also testimony from the Domestic Sales Manager of Buena Vista that Fine was never responsible for determining which film would be awarded to which theatre.

Similarly, testimony from Paramount officials established that Fine did not determine to whom films of Paramount would be awarded in Memphis when Fine was a Branch Manager for Paramount after leaving Buena Vista.

Additionally, page 71 of the Fine testimony is as follows:

Q. Now, in fact, Mr. Fine, when you were branch manager for Paramount Pictures Corporation, you never conspired with any exhibitor in the Memphis market to deprive the Balmoral of first run films, did you?

A. No.

Q. And you reported to Wayne Lewellyn over in Dallas, Texas?

A. Yes.

Q. And there wasn't any agreement between Paramount and any exhibitor in the Memphis market to deprive the Balmoral of first run pictures, was there?

A. No.

The record contains ample evidence which would authorize the jury to seriously impeach the testimony of Fine offered to support plaintiff's contentions because Fine was a disgruntled employee of Buena Vista and Paramount and was fired from Paramount due to a conflict of interest.

As with Buena Vista and Paramount, the plaintiff's arguments concerning Universal cannot support the granting of a new trial in the face of the record established at trial. The evidence was sufficient for the jury to reasonably conclude that Universal licensed its films to the theatres which gave it the best opportunity to earn the most revenue.

The plaintiff's principal argument concerning Universal is that it played its most profitable films between 1975 and 1977 at the largest and highest grossing movie theatre in Memphis, the Park. The plaintiff called the Park's operator, Mr. John Gannon, as one of its witnesses. His testimony indicated that no agreement existed between Universal and the Park. The agreement about which he testified was one among exhibitors and directed at the distributors instead of being with them.

Mr. Gannon testified that the primary purpose of the exhibitor split in Memphis was to lower the guarantees which the exhibitors were having to pay to the dsitributors; thus, the split agreement was adverse to the interests of the distributors. Mr. Gannon further stated that no distribu-

tor agreed that the Park Theatre would or would not be awarded certain pictures. Mr. Gannon also testified that he had to bid for the Universal films he wanted and submit the best bid in order to obtain the film. (Test. of Gannon).

The plaintiff next argues that because it submitted bids which contained monetary guarantees to Universal while the Park submitted only advances that the Balmoral's offer should have been accepted. A guarantee is only one factor which must be considered in evaluating a bid, and where, in the judgment of the distributor a guarantee from one theatre will not equal the anticipated film rental from a competing theatre, then the amount of the guarantee is not controlling. Mr. Charles Arendall, the plaintiff's own film booker, testified that when a distributor believed that a film was going to be a "blockbuster," a guarantee would not be as important to the distributor because it expected to earn in excess of that guarantee in any event.

The detailed evidence adduced at trial also supports the jury's conclusion that Universal independently licensed its films to the theatre offering it the best opportunity to earn film rental. The record is replete with evidence indicating that the Park Theatre was the best grossing theatre in Memphis and that Mr. Gannon was a very smart film buyer and an excellent promoter of films in the city. The Park Theatre had a long and established track record and had demonstrated its ability to generate income on films whether or not a guarantee was provided. The superior grossing potential of the Park Theatre is amply supported by the evidence in the record. When one looks at the films which were played at that theatre, this fact becomes evident, one of the films being the record-breaking "blockbuster," "Jaws."

On the film "The Hindenberg," the Balmoral offered a $15,000 guarantee and a $10,000 advance. This was prior to the time that the theatre had opened. The Park Theatre offered a $25,000 advance and was awarded the film. However, the film rental which was paid to Universal by the Park was $70,884 (Def. Exh. 1798).

Similarly, on the movie "Midway" the plaintiff offered a guarantee of $20,000 and the Park offered an advance of $60,000. The film rental which was paid to Universal by Park was $107,664. (*Id.*) In contrast, when the plaintiff was awarded Universal's "Rooster Cogburn," with a $35,000 guarantee, Universal only earned that amount because the disturbortor's share of the disappointing box office was less than the guarantee. Therefore, ample reason existed to award films to the Park.

Although the Court concludes that the evidence in the record supports the jury's finding that none of the distributor defendants were engaged in an illegal conspiracy in Memphis, the weight of the evidence in the record also establishes that any injury which the plaintiff suffered was not proximately caused by the activity of any of the distributors. Rather, the plaintiff's lack of profitability was due to factors entirely outside of the control of the defendants.

There is evidence to support that from the time that the plaintiff's theatre opened numerous factors unrelated to the conduct of the defendants which caused the business to fail. First, from October 17, 1975, and lasting for approximately one year, the Balmoral was picketed by union members representing unionized motion picture projectionists. As a result of this activity, the plaintiff sued the union for a quarter of a million dollars, $125,000 of which represented lost profits, lost business and loss of reputation. That petition was verified by Frank Warner, the president of the Balmoral Cinema, Inc. (Def. Exhs. 1853 & 1854).

Second, by Mr. Warner's own admission, Memphis movie-goers simply did not know where his theatre was located. When the plaintiff pulled the Paramount film "Hustle" after only four weeks play time (although it had committed to a six-week run of the film), Mr. Warner wrote to Paramount apologizing for this action and explaining that Memphians simply did not know where his theatre was. (Def. Exh. 1513).

Third, there was evidence that the plaintiff's overhead was higher than any other screen in Memphis, including the Park

which had seating more than twice Balmoral's size. (Def. Exh. 1803). Mr. Warner projected that just to break even, the plaintiff would have had to gross $7,388 per week which is considerably more than what some competing theatres grossed in Memphis at the time. (Def. Exhs. 1787 & 1810A).

Fourth, the plaintiff's selection of films to bid on contributed to its losses. For example, the plaintiff offered a guarantee of $20,000 on the film "Voyage of the Damned" and no guarantee on such films as "Star Wars" and "Close Encounters of the Third Kind." The plaintiff offered a $10,000 advance on the movie "Moses," though neither Mr. Warner nor Mr. Arendall was even aware that it had been shown on network television some months before. Finally, Mr. Warner, the president of the plaintiff, admitted that he expected to lose up to $100,000 in the first 15 to 18 months of operation.

The jury was thus justified in finding that no action of the defendants was the proximate cause of the plaintiff's injuries. *See, e.g., Gradsky v. Sperry Rand Corp.*, 489 F.2d 502 (6th Cir.1973); *Heattransfer Corp. v. Volkswagenwerk*, 553 F.2d 964 (5th Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Therefore, the jury's verdict should not be disturbed.

For the reasons set forth above, the motion of the plaintiff for a new trial against Buena Vista, Paramount and Universal should be denied.

IT IS THEREFORE ORDERED that the Motion for a New Trial filed in behalf of the plaintiff Balmoral Cinema, Inc. is hereby denied.