849 F.2d 608
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sandra Sue BENDER, et al., Plaintiffs-Appellants,
v.
GENERAL MOTORS CORPORATION, Defendant and Third Party
Plaintiff-Appellee,
Dana Corporation, Third-Party Defendant.
 No. 87-3790.
 United States Court of Appeals, Sixth Circuit.
 June 16, 1988.
 
 Before ENGEL, Chief Circuit Judge, and KEITH and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiffs appeal from a jury verdict entered in favor of defendant General Motors Corporation in this diversity negligence action under Ohio law. Plaintiffs challenge: (1) the district court's rulings excluding Plaintiffs' Exhibits 89 and 5; (2) the court's jury instruction on proximate cause; and (3) the weight of the evidence supporting the jury's verdict. We affirm.
 
 I.
 A.
 
 2
 Defendant-appellee General Motors Corporation (GM) purchases automobile body frames for use in its Flint, Michigan Buick plant from the Dana Parrish Corporation in Reading, Pennsylvania. Dana Parrish manufactures the frames and ships them by rail to Flint. The frames are transported in specially equipped harnesses on flatcars designed by GM. After GM unloads the harnesses and frames, it reloads the empty harnesses and sends them back to Dana Parrish where they are later reused.
 
 
 3
 The harnesses are approximately 7 ft. X 10 ft. and weigh approximately 1,000 pounds each. They are designed to fit squarely on top of one another in a stack of five. To keep the stacked harnesses securely "nested" on top of one another and to prevent them from rotating or slipping, each harness is equipped with brackets on all four corners which fit snuggly atop other harnesses. The flatcar is specially designed with pedestals to hold the bottom harness of the stack in place. Thus, while it is not imperative that a stack's bottom harness have all four corner brackets intact, it is essential that a stack's top four harnesses each have all four corner brackets intact or there is a possibility that the upper harnesses will twist or shift in transit.
 
 
 4
 Once a stack is loaded on a flatcar, GM personnel secure each corner by connecting tie-down chains from the floor of the car to brackets on the uppermost harness. These four chains are fastened onto separate turnbuckles which are each fastened to the floor of the car. After the turnbuckles have been manually tightened with a wrench, locking collars or caps are placed over them to keep the turnbuckles from unwinding during shipment. Failure to properly stack the harnesses or to tighten them down can cause the entire stack to shift during transportation.
 
 
 5
 On December 18, 1982, GM personnel unloaded a flatcar of frames shipped by Dana Parrish to Flint. The personnel, George Fisher and Robert Nepf, were the only employees who regularly unloaded frames at the Flint plant. Later that same day, Fisher and Nepf reloaded the car with five empty harnesses. While neither specifically recalled reloading the flatcar in question, they both testified that they always followed all relevant GM loading instructions and procedures. Fisher and Nepf testified that GM's procedures mandate that each of the upper four harnesses in every stack have all four corner brackets intact and that each stack be tightly secured with four chains and turnbuckle mechanisms.
 
 
 6
 The car was picked up by the Chesapeake & Ohio Railroad ("C & O") for its return journey to Conway, Pennsylvania. A C & O foreman, Merrill Schmitzer, testified that the railroad's personnel routinely gave GM's outgoing flatcars two inspections. Schmitzer could not, however, recall whether the specific car which GM shipped on December 18th passed inspection. According to Schmitzer, these inspections were customarily designed to ensure that the bottom harness was properly placed on top of the pedestals, that the upper four harnesses each had four retaining brackets intact, and that the chains and turnbuckles were tightly fastened. Cars that failed C & O's inspections were not shipped until the loads were resecured. GM's flatcars are carried by C & O to Toledo where they are transferred to Conrail for the remainder of their journey to Pennsylvania. Schmitzer testified that Conrail also inspects GM cars prior to transport.
 
 
 7
 On December 20th, the car Fisher and Nepf loaded two days earlier was eastbound under the direction of a Conrail crew including plaintiff-appellant Douglas Whiteamire, Conductor, and James Bender (deceased), Flagman. As the train passed Mansfield, Ohio, a Conrail track foreman working on the south side of the main tracks noticed that the load of harnesses had shifted to the south side of the flatcar. According to the foreman, Bernard Walton, the load extended over the side of the car by at least two feet. Whiteamire and Bender were notified by radio. They decided to divert the flatcar to the nearest siding, about three miles to the east. Whiteamire and Bender rode atop of the car during the diversion maneuver, holding onto the stacked harnesses as the car approached the siding at 15 to 20 miles per hour. According to Whiteamire, as the train passed under an overpass with close clearance, the load of harnesses suddenly shifted further to the south, striking a bridge abutment. Both Whiteamire and Bender were knocked from the flatcar. Bender's head struck an adjacent track and he was killed instantly. Whiteamire suffered various bodily injuries.
 
 
 8
 Whiteamire and Sandra Sue Bender, administratrix of James Bender's estate, brought separate diversity actions (later consolidated) alleging that GM acted negligently in failing to properly secure the harness assembly onto the flatcar. GM answered, inter alia, that it had acted with due care and was not responsible for plaintiffs' injuries. In essence, GM contended that the flatcar was properly loaded when it left its Flint plant and that GM did not know how or when the stack later shifted. The jury returned a general verdict for GM and plaintiffs appealed.
 
 B.
 
 9
 Plaintiffs' case relied strongly upon the testimony of Whiteamire. Whiteamire testified that when he inspected the moving car, two of the five harnesses were twisted in a clockwise direction to the point where they extended three to five inches over the edge of the flatcar. He further testified that three of the four tie-down chains were slack; that one of the chains had a missing locking collar; that several harnesses had missing corner brackets; and that four or five of the corner brackets were missing from the top four harnesses. In its defense, GM offered the testimony of the employees who loaded the car, Fisher and Nepf, Amy Rossio, the materials manager at GM's Buick assembly plant in Flint, Donald Trent, an electrical engineer and GM administrator who previously supervised the mechanical engineer, and Stanley Kovacheff, who designed GM's harness securement system. Trent, along with Kovacheff and another GM representative, had investigated the flatcar, harnesses, and accident site approximately two weeks after the accident in question.
 
 
 10
 Through Whiteamire's testimony and a variety of circumstantial evidence, plaintiffs attempted to show that the flatcar was improperly loaded when it left GM's Flint plant. In particular, plaintiffs theorized that Fisher and Nepf had improperly loaded the harness stack by using only three locking collars and by stacking harnesses which had less than four corner brackets. Plaintiffs elicited testimony from Trent concerning his knowledge of the harness system and the results of his personal investigation of the accident. Trent testified that he had heard that one of the turnbuckle locks was never found at the accident site and that his own investigation had shown that eight corner brackets were missing from the five harnesses originally loaded on December 18th. Trent was uncertain, however, whether the turnbuckle lock and corner brackets were broken loose as a result of the impact of the accident.
 
 
 11
 Plaintiffs also proffered internal GM documents, distributed to GM's body assembly plants, delineating the proper harness loading procedure. The documents essentially stated that harnesses with bad or missing corner brackets should be placed on the bottom of the harness return stacks and that the turnbuckles on all four tie-down chains should be tightened securely with the locking collar slipped into the lock position. Trent agreed that an improperly loaded stack or absent locking collar could cause a load to shift.
 
 
 12
 Plaintiffs unsuccessfully attempted to introduce an internal GM memorandum (Plaintiffs' Exhibit 89) authored by Kovacheff, the harness systems designer, which set forth the possible reasons for excessive harness stack movement. Plaintiffs were also unsuccessful in their attempt to introduce Trent's tabulated report of the results of his investigation of the accident (Plaintiffs' Exhibit 5). The trial court excluded both documents as inadmissible under the hearsay rule. Plaintiffs argue on appeal that the court's evidentiary rulings were in error and caused them substantial prejudice. Plaintiffs also challenge the court's jury instruction on proximate cause.
 
 II.
 A. Exhibit 89
 
 13
 Plaintiffs attempted to introduce into evidence a report which Kovacheff had written following his and Trent's investigation of the accident. The report, Plaintiffs' Exhibit 89, concluded that excessive harness stack movement could occur if corner brackets were missing from the stack and/or if the stack was not tightly chained. Kovacheff did not testify at trial. Consequently, plaintiffs attempted to admit Exhibit 89 through the testimony of Trent. The district court held the document inadmissible as hearsay. On appeal, plaintiffs argue, inter alia, that Exhibit 89 was admissible under Fed.R.Evid. 801(d)(2)(D) as an admission by an agent of a party-opponent and under Fed.R.Evid. 803(6) as a business record. While we agree with the trial court that Exhibit 89 was not admissible as a business record under Rule 803(6), we find that the exhibit constituted an admission under Rule 801 and was improperly excluded.
 
 
 14
 Rule 801(d)(2)(D) provides that a statement is not hearsay if it is offered against a party and is "a statement by his [the party's] agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." GM does not deny that Kovacheff's report is a statement by an agent concerning matters within the scope of his agency. Rather, GM contends that Kovacheff's statement fails to qualify as an admission because it is consistent with the position GM took throughout the proceedings.[1] GM has, however, cited no authority for the proposition that a party-opponent's admission must be inconsistent with that party's defense to be admissible under Rule 801(d)(2)(D). Moreover, there is no requirement under the Federal Rules of Evidence or at the common law, that an admission of a party opponent be against the declarant's interest when made or when offered in evidence. An admission under 801(d)(2)(D) is not an admission "against interest", it is an admission of a party opponent.[2] Accordingly, we must examine the magnitude of the district court's error.
 
 
 15
 "[N]o error in the admission or exclusion of evidence is ground for reversal or granting a new trial unless refusal to take such action appears to the court to be inconsistent with substantial justice." TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 550 (6th Cir.1981) (citations omitted); Fed.R.Civ.Pro. 61. After a careful review of the record, we conclude that plaintiffs have failed to show adequate grounds for reversal because every point in Kovacheff's improperly excluded report was repeatedly conceded by GM's witnesses, including Trent, Fisher, and Nepf.
 
 
 16
 Trent testified on cross-examination that he agreed that "one of the most basic requirements for making sure that you [GM] get[s] a secure stack of five harnesses," is that each harness fit over the corners of the harness below. Trent also agreed "that the absence of a tie-down collar on one of those assemblies [a harness stack] would be a condition which would cause a tie-down assembly to become loose in the course of rail transportation." Trent also read from an internal report by Kovacheff which stated that "harnesses will shift if the corner retaining brackets are missing or damaged, or the tie-down chains are not securely tightened." Trent generally agreed that if a stack was missing a corner bracket on any one of the upper four harnesses that any one of those four harnesses might gradually shift during transportation and that GM "should not be returning equipment that is not safe."
 
 
 17
 Other GM employees agreed with Trent's testimony. George Fisher and Robert Nepf both testified that loading a harness with a missing corner bracket on top of another could create safety problems and that GM's rules prohibited stacking a harness with a missing corner bracket above the lowest level in a stack. Although Fisher acknowledged that the corner brackets were vulnerable and were often broken off, he claimed that he always made sure that there was a secure load. In sum, given that the substance of Exhibit 89 was generally admitted even though the exhibit was not, we find no ground for reversal.
 
 B. Exhibit 5
 
 18
 Plaintiffs' Exhibit 5 represented the "Confidential Inspection Report" prepared by Trent and Kovacheff shortly after the accident in question. The report indicated that a total of eight corner brackets were missing from the five harnesses and that only two of the five harnesses inspected had the appearance of "old breaks." The report also stated that "No missing parts were found at the accident site. Railroad personnel also advised they had not seen parts at the site of the accident."
 
 
 19
 According to plaintiffs, Trent referred to the report, although not specifically as Exhibit 5, throughout his testimony on cross-examination. However, the exhibit was not offered into evidence until a later in-chambers conference. The court sustained GM's objection to the admission of Exhibit 5 on the basis that it was not properly identified at trial. Plaintiffs failed to make a contemporaneous offer of proof as required by Fed.R.Evid. 103(a)(2).
 
 
 20
 Rule 103(a)(2) precludes a party from assigning error to a trial court ruling excluding evidence "unless a substantial right of the party is affected," and "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Based upon our review of the record, we conclude that the substance of Exhibit 5 was not immediately apparent to the district court. See, e.g., Walter v. Transidyne General Corp., 697 F.2d 130, 134 (6th Cir.1983). Accordingly, since plaintiffs failed to make an offer of proof with respect to Exhibit 5, they have waived their right to argue that the court's ruling was in error.[3]
 
 
 21
 Further, we are unable to agree with plaintiffs' contention that Exhibit 5 was admissible under Fed.R.Evid. 612 as a writing used to refresh Trent's memory. The record is devoid of any indication that the proper foundation was laid to permit the use of Exhibit 5 to refresh present recollection, or that Trent used Exhibit 5 prior to or during his testimony to refresh his recollection. In sum, we find plaintiffs' Rule 612 argument to be meritless.
 
 III.
 
 22
 Over plaintiffs' objection, GM successfully requested that the court deliver a jury instruction on proximate cause which mirrored the instruction given by the court in Hurt v. Rogers Transportation, 164 Ohio St. 323, N.E.2d 824 (1955).[4] On appeal, plaintiffs argue that the facts of this case are distinguishable from those in Hurt. Consequently, plaintiffs contend that the court's instruction is in error. We find plaintiffs' challenge to be moot because the jury never relied upon the challenged instruction. The jury answered only one interrogatory. That interrogatory, "Was the defendant negligent?," was answered, "No." In accord with their instructions, the jurors then proceeded to the general verdict form and entered a verdict for GM. The jury could not have considered GM's proffered instruction on proximate cause unless it first found that GM had created an existing hazard. By finding GM not negligent, the jury implicitly found that GM did not create a hazard.
 
 IV.
 
 23
 Plaintiffs contend that the jury's verdict should be reversed because it is unsupported by the manifest weight of the evidence. Plaintiffs did not, however, move the district court for a judgment notwithstanding the verdict or for a new trial.
 
 
 24
 The scope of review in civil cases is limited to those errors adequately preserved in the trial court. The only vehicle by which questions of excessiveness or inadequacy of verdicts can be submitted to the trial court is a motion for new trial. That motion is addressed to the trial court's discretion, and on appeal the scope of review is limited to whether the trial court abused its discretion in ruling on the motion.... Absent a timely motion for new trial and the trial court's ruling thereon this court may not review the alleged excessiveness of the verdicts.
 
 
 25
 Hahn v. Becker, 588 F.2d 768, 771 (7th Cir.1979) (citation omitted). Plaintiffs' failure to raise their challenge to the jury's verdict in the district court precludes this court from examining the verdict on appeal.
 
 V.
 
 26
 For the reasons set forth above, we AFFIRM the jury's verdict in favor of defendant GM.
 
 
 
 [1]
 At trial, GM agreed that a harness stack could shift because the top four harnesses in the stack lacked a full compliment of corner brackets or because the stack's four tie-down chains were secured by only three collar locks, but denied that it loaded the flatcar in question in such a manner
 
 
 [2]
 GM has apparently confused two separate exceptions to the hearsay rule, declarations against interest (Rule 801(d)(1)(A)) and admissions by party-opponents (Rule 801(d)(2)). See generally McCormick on Evidence Sec. 263 at 630-31 (1972)
 
 
 [3]
 Although plaintiffs have waived their right to argue that the written findings embodied in Exhibit 5 should have been admitted, they have not waived their right to challenge the court's rulings with respect to Trent's testimony concerning the findings of his and Kovacheff's inspection. In this regard, plaintiffs have challenged the propriety of the court's ruling excluding Trent's lay opinion as to the age of the corner bracket breaks he discovered during his inspection. The district court concluded that Trent's opinion would not be "helpful" because the ability to determine the age of a broken metal corner bracket was outside the perception and common experience of a lay witness. See Fed.R.Evid. 701. We hold that the district court acted within its discretion in concluding that a metallurgist's opinion was necessary to establish whether the breaks "appeared to be something that could have occurred within two or three months."
 
 
 [4]
 The district court's instruction read as follows:
 I instruct you that as a matter of law, that if an independent and responsible party was aware of the existing hazard and could or should have eliminated the hazard, there is a break in the chain of causation and the party who created such an original hazard is relieved from liability because of such interventon of other parties. In other words, if you find that either Conrail, Douglas Whiteamire, James Bender or others were aware of the hazard of a shifted load of freight and either could have eliminated it through alternative means, there is a break in the chain of causation and General Motors is relieved from liability.